# IN THE SUPREME COURT OF IOWA

No. 16–0134

Filed May 4, 2018

**STATE OF IOWA,**

Appellee,

vs.

**MICHAEL CORY KELSO-CHRISTY,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Marion County, Martha L. Mertz and Gregory A. Hulse, Judges.

Defendant seeks further review of his conviction for burglary in the second degree, contending he did not enter the premises with the specific intent to commit sexual abuse. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller and Sheryl Soich, Assistant Attorneys General, and Edward Bull, County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal, we must primarily decide if one person's consent to engage in a sexual encounter with another, obtained through the other actor's fraudulent misrepresentations that he is someone else, constitutes a valid consent to engage in the sexual encounter. We conclude such deception does not establish consent to engage in a sexual encounter. We affirm the judgment of the district court and the decision of the court of appeals.

## I. Factual Background and Proceedings.

In April 2015, Michael Kelso-Christy created a fake Facebook profile of a man, S.P., who had attended his high school. Posing as S.P., Kelso-Christy began to send Facebook messages to women who also attended school with S.P. The messages informed women that S.P.'s profile had been hacked and that he had created a new one. Then, Kelso-Christy would attempt to solicit nude photographs or proposition the women for sex.

On April 26, Kelso-Christy sent one such Facebook message to S.G. The two began a conversation, as S.G. knew S.P. from high school. Posing as S.P., Kelso-Christy gave S.G. his phone number and the two began texting. The conversation turned sexual in nature. Kelso-Christy repeatedly asked S.G. to send him nude photographs of herself, which she ultimately did. Then, Kelso-Christy, still posing as S.P., suggested the two have a sexual encounter wherein S.G. would be blindfolded and restrained in handcuffs. S.G. agreed and invited S.P. to her home.

Kelso-Christy instructed S.G. to blindfold herself and wait for his arrival, which she did. When Kelso-Christy arrived, he did not say anything, but rather quickly handcuffed S.G. and proceeded to have

intercourse. Afterwards, he immediately left S.G.'s home without undoing the blindfold or handcuffs. S.G. eventually freed herself and saw a text message from S.P. saying his brother was in the hospital and he could not stay. S.G. grew suspicious when S.P. stopped responding to text messages and the Facebook profile was no longer active. S.G. also did not see any Facebook posts by others indicating that S.P.'s brother was hospitalized. The next day, S.G. sent a message to the original S.P. Facebook account and determined that someone had been impersonating him.

S.G. immediately contacted the sheriff's office and reported her assault. S.G. repeatedly affirmed she only consented to an encounter with S.P., whom she knew personally, and never consented to any encounter with Kelso-Christy. An investigation linked Kelso-Christy's phone number to the one given to S.G., and a latent print matching Kelso-Christy's left thumbprint was found on the condom wrapper used during the encounter. Pursuant to a valid warrant, officers searched Kelso-Christy's home and found a list of women's names in his bedroom that included S.G.'s. Kelso-Christy was arrested and charged by trial information with burglary in the first degree and sexual abuse in the third degree. The State and Kelso-Christy reached a plea arrangement in which the State reduced the charges to only burglary in the second degree, and Kelso-Christy agreed not to resist a ten-year prison sentence if he was found guilty.

Prior to trial, Kelso-Christy filed a motion to dismiss the charge. He asserted the stipulated evidence lacked any indicia that he entered S.G.'s residence with the specific intent to commit sexual abuse. Kelso-Christy argued S.G. consented to the sex act, and any concealment of his true identity was mere fraud in the inducement. The district court overruled the motion. It concluded S.G. only consented to have an encounter with S.P. The district court reasoned that consent to a sex act inherently

requires knowledge of the actual identity of the partner. Thus, the court concluded that Kelso-Christy's deception amounted to fraud in fact, which vitiated any prior consent given by S.G.

Kelso-Christy agreed to a trial on the minutes of testimony. The minutes indicated S.G. would testify that she only consented to engage in a sexual encounter with S.P. The minutes also provided that S.P. would testify that he never created a separate Facebook account and that he had been contacted by other men who were angry with him for soliciting sex from their wives and girlfriends.

The district court found Kelso-Christy guilty of burglary in the second degree in violation of Iowa Code section 713.5 (2015). The court concluded (1) Kelso-Christy entered S.G.'s residence, (2) the residence was an occupied structure, (3) Kelso-Christy did not have authority or permission to enter the residence, (4) the residence was not open to the public, (5) one or more persons was present in the structure, and (6) Kelso-Christy entered the residence with the specific intent to commit sexual abuse. The district court sentenced Kelso-Christy to ten years in prison and imposed a $1000 fine.

Kelso-Christy appealed. He asserted the record lacked sufficient evidence to find he acted with the specific intent to commit sexual abuse. We transferred the case to the court of appeals. The court found S.G. consented to a sexual encounter with a specific former classmate and, instead, experienced an entirely different act—an act to which she plainly did not consent. Accordingly, the court held there was sufficient evidence to conclude Kelso-Christy entered S.G.'s home with the specific intent to commit sexual abuse. Kelso-Christy applied for further review, which we granted.

## II. Standard of Review.

We review the sufficiency of the evidence for correction of errors at law. *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). Pursuant to this review, "we examine whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). Substantial evidence exists when the evidence "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Id.*

## III. Analysis.

To support the conviction in this case, the State was required to prove six elements beyond a reasonable doubt: (1) the defendant entered a structure; (2) the structure was occupied; (3) the structure was not open to the public; (4) the defendant did not have permission to enter the structure; (5) one or more persons were present in the structure at the time of entry; and (6) the defendant entered the structure with an intent to commit a felony, assault, or theft therein. Iowa Code § 713.1, .5. The parties do not dispute that the State has proven the first five elements.[1] Accordingly, we only consider whether Kelso-Christy entered S.G.'s residence with the specific intent to commit sexual abuse. Kelso-Christy primarily argues his nefarious actions in arranging the encounter with S.G. did not vitiate her consent and that the State failed to submit any evidence that he entered her house with the intent to commit sexual abuse.

**A. *Mens Rea* and Sexual Abuse.** The focal point of the crime of sexual abuse is consent. *Id.* § 709.1(1). This critical element does not

---

[1]Kelso-Christy's position on appeal, therefore, is that he obtained consent to sexual intercourse with S.G. by posing as S.P., but he did not obtain permission to enter S.G.'s home by posing as S.P.

inquire into the mind of the defendant to create a specific-intent crime, but turns on the intentions and mental state of the victim. *See State v. Riles-El*, 453 N.W.2d 538, 539 (Iowa Ct. App. 1990) ("[S]exual abuse is a general intent crime."); *see also State v. Booth*, 169 N.W.2d 869, 874 (Iowa 1969) ("[T]he crime of rape requires no specific intent. The statutory definition makes the proof of certain acts alone sufficient and the general criminal intent is supplied by the performance of such acts."). In this case, however, the defendant was not convicted of sexual abuse. Instead, he was charged and convicted of burglary based upon the entry into an occupied structure with the intent to commit sexual abuse. Thus, the crime of burglary was committed only if the offender intended to engage in a nonconsensual sex act when entering the residence of S.G. Accordingly, our inquiry is ultimately directed at the intent of the defendant, but we nevertheless examine that intent to see if the facts support a finding of intent to engage in a sex act without the consent of the other person.

**B. Specific Intent to Commit Sexual Abuse.**

1. *Sexual abuse.* Sexual abuse is "[a]ny sex act . . . done by force or against the will of the other." Iowa Code § 709.1(1). Beyond the "against the will of the other" standard, the legislature has codified specific, additional instances of nonconsent. *See id.* §§ 709.1–.4. By utilizing both broad and specific conceptualizations of sexual abuse, the legislature sought to "capture both case-specific circumstances of an 'actual failure of consent' as well as circumstances when the legislature has declared 'consent as incompetent' or nonexistent." *Meyers*, 799 N.W.2d at 143 (quoting Model Penal Code & Commentaries § 213.1 cmt. 4, at 301 (1980)).

The purpose of criminalizing sexual abuse is to protect the freedom of choice to engage in sex acts. *Id.* We have previously explained that "the 'against the will of another' standard seeks to broadly protect persons from

nonconsensual sex acts, even under circumstances showing the victim had no opportunity or ability to consent." *Id.* Indeed, in furtherance of the statute's clear purpose, we inquire into whether the victim gave meaningful consent and consider the "circumstances indicating any overreaching by the accused, together with circumstances indicating any lack of consent by the other person." *Id.* at 146.

At the same time, we are mindful that "the [sex abuse] statute as a whole expresses no limit on the conduct or circumstances that can be used to establish nonconsent." *Id.* at 143. For example, in *Meyers*, we considered whether the "against the will" element "includes circumstances in which pervasive psychological coercion vitiates the consent of the victim." *Id.* at 140. Although the statute did not specifically provide for "rape by psychological coercion" within chapter 709, we explained "the legislature never intended to limit the circumstances that could be used to vitiate consent under the 'by force or against the will' standard." *Id.* at 144. Rather, the "against the will" element is deliberately broad and consciously designed to capture all circumstances when "there is an actual failure of consent." *Id.* at 143 (quoting Model Penal Code & Commentaries § 213.1 cmt. 4, at 301). Accordingly, we held "psychological force or inability to consent based on the relationship and circumstance of the participants may give rise to a conviction under the 'against the will' element of" sexual abuse. *Id.* at 146.

As in other cases that do not involve conduct that is expressly identified as sexual abuse within section 709.1 or section 709.4, we apply the "against the will of the other" standard to the case-specific circumstances to determine whether there was an actual failure of consent. We look to Kelso-Christy's state of mind to determine the

sufficiency of evidence that he intended to engage in a sex act in the absence of consent.

    2. *Specific intent.* As to the specific intent of Kelso-Christy, we have said that

> [i]ntent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience.

*State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992) (quoting *State v. Erving*, 346 N.W.2d 833, 836 (Iowa 1984)). "Direct and circumstantial evidence are equally probative." *State v. Maynard*, 379 N.W.2d 382, 383 (Iowa Ct. App. 1985). A defendant acts with the specific intent to commit sexual abuse if

> [t]he overt act . . . reach[es] far enough towards the accomplishment, toward the desired result, to amount to the commencement of the consummation, not merely preparatory. It need not be the last proximate act to the consummation of the offense attempted to be perpetrated, but it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made.

*State v. Radeke*, 444 N.W.2d 476, 478 (Iowa 1989) (quoting *Maynard*, 279 N.W.2d at 383).

    In *Casady*, we determined a defendant's prior crimes evinced a modus operandi of committing sexual abuse. 491 N.W.2d at 788. In that case, the defendant approached a woman in his vehicle, "lured her to the window, and grabbed her arms in an attempt to pull her inside the car." *Id.* at 786. The defendant "did not make any sexual comment to [the victim], touch her in a sexual manner, attempt to remove any clothing, or act in any other way which would indicate a plan to engage in sexual activity." *Id.* at 787.

However, the State presented evidence of two prior crimes involving strikingly similar facts. *Id.* at 784. In 1976, the defendant attempted to lure a woman into his car, and when she refused, he struck her and began to remove her clothing before a passerby intervened. *Id.* In custody, the defendant informed the officers "he intended to have sex with the woman." *Id.* In 1979, the defendant again attempted to lure a woman into his car. *Id.* at 784–85. The defendant pulled her into the vehicle, "drove to a remote area[,] and repeatedly sexually assaulted" her. *Id.* at 785. We concluded the defendant's assault in the case at issue was "equally similar to the 1979 crime he committed," and the "modus operandi was clearly parallel." *Id.* at 788. Thus, "the trial court could reasonably infer that if [the victim] had not escaped, Casady would have continued with his plan and committed sexual abuse." *Id.*

In *Radeke*, the defendant made an appointment to meet a real estate agent in a remote area using a false name and personal history. 444 N.W.2d at 478. He specifically requested that the female agent, rather than the homeowner, show him the house. *Id.* He falsely informed the agent he was married with children and that his employer was purchasing the home, despite being unemployed, unmarried, and without children. *Id.* During the viewing of the home, the "defendant got behind the agent, put his hands over her mouth, grabbed her around the waist, and told her that if she did as he said, he would not hurt her." *Id.* at 477. Defendant then instructed the agent to unbutton her blouse, which she did. *Id.* The agent then managed to escape the defendant's hold. *Id.* The defendant apologized and left immediately. *Id.*

We concluded sufficient evidence existed to convict the defendant of assault with intent to commit sexual abuse. *Id.* at 479. First, we explained, "Planned deception is inconsistent with claimed innocent

purposes," and a jury could easily infer the defendant's misrepresentations "were made to prevent his apprehension after committing an illegal act." *Id.* at 478. Second, the defendant only left after the owner informed him "that her office knew where she was and that the owner was on his way home." *Id.* Thus, a jury could infer that "her statements made him so fearful of discovery that he then chose to leave rather than to sexually assault her." *Id.* Third, the defendant's "own words and actions" lent themselves to a finding of specific intent. *Id.* "The evidence of deception, assault and defendant's desire to have sex are circumstances from which the jury could infer an intent to commit sexual abuse." *Id.* at 479. Because the circumstantial evidence was sufficient for a reasonable juror to conclude beyond a reasonable doubt that the defendant acted with the specific intent to commit sexual abuse, we affirmed his conviction. *Id.*

3. *Merits.* In this case, we are challenged to consider how the deception used by Kelso-Christy impacted the issue of consent. Kelso-Christy argues he could not have intended to commit sexual abuse when he entered the residence because S.G. had consented to the encounter and the deception he used did not undermine or vitiate that consent.

In *State v. Bolsinger*, we acknowledged that some forms of deception are substantial enough to negate a prior consent.

> If an act is done that is different from the act the defendant said he would perform, this is fraud in fact. If the act is done as the defendant stated it would be, but it is for some collateral or ulterior purpose, this is fraud in the inducement. Fraud in fact vitiates consent; fraud in the inducement does not. . . .
>
> [I]f deception causes a misunderstanding as to the fact itself (fraud in the *factum*) there is no legally-recognized consent because what happened is not that for which consent was given; whereas consent induced by fraud is as effective as other consent, so far as direct and

> immediate legal consequences are concerned, if the deception relates not to the thing done but merely to some collateral matter (fraud in the inducement).

709 N.W.2d 560, 564 (Iowa 2006) (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* ch. 9, § 3, at 1079 (3d ed. 1982) [hereinafter Perkins & Boyce]).

To illustrate, we observed that the distinction between fraud in fact and fraud in the inducement is commonly seen in cases in which a patient consents to a medical procedure only to discover that the doctor engaged in a sexual act. *Id.* We favorably quoted a treatise that explained when a doctor informs the patient of his or her intention to engage in a sex act, but misrepresents its medical necessity, the doctor's misrepresentation is fraud in the inducement. *Id.* In that instance, "the patient knew exactly what was to be done and was deceived only in regard to a collateral matter—the reason why it was to be done." *Id.* (quoting Perkins & Boyce, at 1079–80). Conversely, a doctor who obtains consent to a legitimate procedure, but then instead performs an undisclosed sexual act, engages in fraud in the factum, and any consent to the "procedure" is vitiated. *Id.*

In *Bolsinger*, we adopted the treatise's reasoning. In that case, a program supervisor in a state facility for delinquent boys repeatedly brought boys into a private room and touched their genitals. *Id.* at 562. The supervisor informed the boys he was checking for injuries and testicular cancer and requested permission before conducting the "exam." *Id.* The boys testified they would not have consented to the touching if they knew the true reason behind the request, which was the supervisor's sexual gratification. *Id.*

Because the boys consented to the encounter, but were misled about the motivations behind it, we held the supervisor's conduct amounted to fraud in the inducement. *Id.* at 564. Had the boys consented to a different

body part being touched and the supervisor instead touched their genitals, the supervisor would have engaged in fraud in fact. *Id.* However, because "the victims were touched in exactly the manner represented to them," the supervisor's deception was fraud in the inducement and did not undermine the boys' consents. *Id.*

Kelso-Christy asserts that the approach we followed in *Bolsinger* is dispositive in this case. He claims his deception initiated through the Facebook page only extended to inducement, not to the sex acts that the two actors subsequently engaged in during the encounter. As with the deception visited on the boys in *Bolsinger* that did not vitiate consent, Kelso-Christy claims no sexual abuse occurred in this case as a matter of law because S.G. consented to the encounter that took place, and his fraud only went to his conduct in inducing her consent. As such, he asserts he could not have committed burglary because he did not have intent to commit sexual abuse when he entered the residence.

As *Bolsinger* reveals, fraud or deceit may or may not vitiate consent to a sexual encounter. The rule we have followed is that consent is vitiated by deceit when the deception is fraud in the fact, but not when the deception is fraud in the inducement. This rule was built on the notion that consent between two actors only extends to the act agreed to by the two persons. If the agreed to act is different from the act that ultimately occurred, there is no consent for that act. However, when the fraud or deception does not result in a different act, but relates to the matter collateral to the act, the consent given is not vitiated because the agreed to act is still the act that occurred.

While the path we pursued in *Bolsinger* can be questioned, it is unnecessary to resolve if it was incorrectly decided. The *Bolsinger* rule did not contemplate situations in which one actor, through fraud or deception,

induces another person to consent to an act under the false pretense the actor is a different person entirely. Matters are collateral when they are not essential to the resolution of an issue, and motives and reasons behind the acts of defendants are generally viewed in our law to be collateral to the elements of the crime and are not part of the crime itself. Thus, it is understandable that deceptive motives can be viewed to be outside the rule that fraud vitiates consent in cases of sexual abuse. Even though the motive may have been fraudulent, the two actors ultimately engaged in the agreed to act.

Yet, consent to engage in a sexual act with one person is not consent to engage in the same act with another actor. Deception in this context is not collateral in any way, but goes to the very heart of the act. When a person is deceived as to who is performing the previously consented to act, the person ultimately experiences an entirely separate act than what was originally agreed to. This approach is consistent with our long-standing principle that consent to engage in sexual intercourse with one person does not imply consent to engage in sexual intercourse with another person. *See State v. Ball*, 262 N.W.2d 278, 279 (Iowa 1978).

In *Ball*, a defendant accused of sexual abuse sought to introduce evidence of the "victim's sexual conduct with third parties during the year preceding this incident." *Id.* We determined the evidence was irrelevant. *Id.* at 281. In so finding, we explained "[w]e have never adopted the principle that a victim's consent to intercourse with one man implies her consent in the case of another, and we reject it now." *Id.* at 280. While this principle was originally adopted in the evidentiary context, we find it is equally applicable in the present case.

Accordingly, it has long been the law that belief in consent to intercourse cannot be predicated upon the victim's consent to intercourse

with someone else. *See also Young v. State*, 429 So. 2d 1162, 1163 (Ala. Crim. App. 1983) ("Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant." (quoting *People v. Cornes*, 399 N.E.2d 1346, 1352 (Ill. App. Ct. 1980))); *State ex rel. Pope v. Super. Ct.*, 545 P.2d 946, 952 (Ariz. 1976) (en banc) ("The fact that a woman consented to sexual intercourse on one occasion is not substantial evidence that she consented on another, but in fact may indicate the contrary."); *Lynn v. State*, 203 S.E.2d 221, 222 (Ga. 1974) ("(The) more satisfactory reason (for the rule) is that her consent in the case of one man does not imply consent in the case of another." (alteration in original) (quoting 3 *Underhill's Criminal Evidence* 1766 (5th ed.))); *Commonwealth v. McKay*, 294 N.E.2d 213, 218 (Mass. 1973) ("[T]he victim's consent to intercourse with one man does not imply her consent in the case of another."); *People v. Williams*, 330 N.W.2d 823, 828 (Mich. 1982) ("[T]he notion that unchaste women are especially prone to lying has become as antiquated and as fatuous as the belief that simply because a woman has consented to intercourse with a third party on another occasion, she probably consented to intercourse with the defendant."); *State v. Hill*, 244 N.W.2d 728, 731 (Minn. 1976) ("[T]he proffered evidence of complainant's prior cohabitation with two men did not have sufficient probative value in the context of this case to permit its introduction on the issue of whether or not she consented to sexual relations with this defendant."); *Goss v. State*, 465 So. 2d 1079, 1082 (Miss. 1985) ("The fact that the prosecutrix voluntarily had sexual relations with her boy friend, Charles Goss, and even that she might possibly have had sex with Jerry Hunt, has little probative value on the issue of consent in the assault in question . . . ."); *State v. Green*, 260 S.E.2d 257, 261 (W. Va. 1979) ("A rape victim's previous sexual conduct with other persons has very little

probative value about her consent to intercourse with a particular person at a particular time."). This law is relevant to this case. Kelso-Christy may have deceived S.G. into consenting to engaging in a sex act with another person, but not with him.

Kelso-Christy relies on two cases from other states to argue that deception as to the actual person who is performing the sexual act cannot give rise to a sexual abuse conviction. In the first case, *People v. Hough*, a New York trial court held that a man who pretended to be his twin brother in order to have sexual intercourse with his brother's girlfriend was not guilty of sexual misconduct. 607 N.Y.S.2d 884, 884, 886–87 (Dist. Ct. 1994). The outcome in *Hough*, however, rested on the prosecutor's error in charging the defendant with sexual misconduct rather than sexual abuse. For the crime of sexual misconduct, lack of consent "results from forcible compulsion or incapacity to consent." *Id.* at 885. Conversely, for the crime of sexual abuse, nonconsent exists under "any circumstances . . . in which the victim does not expressly or impliedly acquiesce in the actor's conduct." *Id.* The court found "[t]he lack of consent which forms the basis of the charge against defendant is not claimed to have been by forcible compulsion or the complainant's incapacity to consent." *Id.* Although the definition of nonconsent for sexual misconduct is narrow, "[w]here the Legislature intended to extend the definition of lack of consent, it did. For instance, lack of consent as applied to the crime of sexual abuse . . . ." *Id.* at 887. Accordingly, the court had "no choice but to dismiss the charge of sexual misconduct." *Id.*

Importantly, the court then explained "this decision is not concluding that the defendant did not do anything wrong . . . . Instead, what this court is saying is that the District Attorney's office has charged the defendant with the wrong crime." *Id.* The court, therefore, did not find

that deception as to the actual person performing the sexual act is not sexual abuse. Rather, the court found that the narrow, exhaustive definition of nonconsent for sexual misconduct did not contemplate the defendant's actions. Here, Iowa's sexual abuse statute, in stark contrast with the statute at issue in *Hough*, is intentionally broad and seeks to capture all instances of actual nonconsent. Thus, *Hough*'s holding that the defendant's scheme did not involve forcible compulsion or incapacity is not instructive.

Second, Kelso-Christy relies on the Massachusetts Supreme Court case, *Suliveres v. Commonwealth*, 865 N.E.2d 1086 (Mass. 2007). In Massachusetts, the crime of rape is defined as "sexual intercourse compelled 'by force *and* against [the] will' of the victim." *Id.* at 1087 (alteration in original) (emphasis added) (quoting Mass. Gen. Laws ch. 265, § 22). In 1959, the Massachusetts Supreme Court concluded that "it is not rape when consent to sexual intercourse is obtained through fraud or deceit," as " '[f]raud cannot be allowed to supply the place of force which the statute makes mandatory.' " *Id.* (alteration in original) (quoting *Commonwealth v. Goldenberg*, 155 N.E.2d 187, 192 (Mass. 1959)). At issue in *Suliveres* was whether the court should "overrule the *Goldenberg* decision and hold that misrepresentations can in fact substitute for the requisite force." *Id.*

The court declined to overturn *Goldenberg*. The court explained that it has "never suggested that force is not an element of the crime, or that 'by force' is synonymous with lack of consent." *Id.* at 1089. The court was not free to remove elements of a crime. *Id.* Further, *Goldenberg* had been the law for forty-eight years and yet the legislature failed to address the holding. *Id.* at 1090. Thus, in Massachusetts, the crime of rape requires proving the element of force, and deception as to the actual person

performing the sex act cannot supplant the necessary statutory element of force. *Id.* However, the court did conclude that, as in *Goldenberg*, deception as to the person performing the sex act was fraud in the inducement, as "there is no claim that the complainant did not know she was consenting to a sex act." *Id.*

We disagree with the characterization of the conduct in *Suliveres* as fraud in the inducement. As in this case, the deception was no collateral matter, but went to the heart of the act. Furthermore, beyond that characterization, *Suliveres* rests entirely on the force element in the Massachusetts rape statute. The Iowa legislature eliminated the force requirement for sexual abuse in 1921. 1921 Iowa Acts ch. 192, § 1. Thus, we are not adding or removing elements from the sexual abuse statute, but rather considering whether, in light of all the circumstances, Kelso-Christy intended to engage in sexual intercourse in the absence of consent. Reliance on *Suliveres* is therefore inapposite.

Accordingly, we reject the claim by Kelso-Christy that S.G. consented to the sexual encounter as a matter of law because the deception he engaged in was insufficient to vitiate the consent. We, therefore, consider whether sufficient evidence was presented to support the finding that Kelso-Christy intended to engage in a sexual encounter with S.G. in the absence of her consent at the time he entered the house. Under this framework, we consider what was known to Kelso-Christy at the time of entry and whether there is substantial evidence in the record to support a finding that he entered S.G.'s residence with the intent to commit sexual abuse.

When Kelso-Christy entered S.G.'s home, he knew that S.G. intended to have a sexual encounter with another man, but not with him. Unlike in *Bolsinger*, Kelso-Christy knew S.G. never consented to *any*

physical contact with him, sexual or otherwise. Rather, Kelso-Christy knew S.G. wished to have sex with someone else and simply decided that fact gave him license to proceed, regardless of S.G.'s actual feelings or preferences. Because it has long been the law in Iowa that consent to sex with one man cannot imply consent to sex with another, Kelso-Christy could not have believed S.G. consented to a sexual encounter with him.

Further, the exact circumstances of Kelso-Christy's scheme buttress our finding that he entered S.G.'s residence with the intent to proceed with sexual intercourse in the absence of consent. Kelso-Christy created a fake social media profile and made plans to ensure that S.G. would be blindfolded and bound during the duration of the encounter. A reasonable juror could conclude that Kelso-Christy anticipated that S.G. might discover his ploy and attempt to flee, and thus he took steps to ensure that she would be unable to escape. *See Radeke*, 444 N.W.2d at 478–79. Accordingly, we find Kelso-Christy entered S.G.'s home with the intent to engage in sexual intercourse with someone who had not consented to the encounter.

### IV. Conclusion.

The identity of a sexual partner is no mere collateral matter. Women, and men, must be free to decide, on their own terms, who their sexual partners will be. Kelso-Christy's actions denied S.G. the "freedom of choice" that breathes life into our sexual abuse statutes. *Meyers*, 799 N.W.2d at 143. That she consented to an encounter with another man is irrelevant. Because substantial evidence in the record supports a finding that Kelso-Christy entered S.G.'s home with the intent to commit sexual abuse, we affirm his conviction.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Wiggins and Appel, JJ., who dissent, and Hecht, J., who takes no part.

**WIGGINS, Justice (dissenting).**

I respectfully dissent for a number of reasons. Before I delve into the crux of my dissent based on the language of Iowa Code section 709.1(1) (2015), I discuss some preliminary matters.

First, I mention the distinction between fraud in fact and fraud in the inducement. Fraud in fact means the defendant misrepresents the nature of the act performed. *State v. Bolsinger*, 709 N.W.2d 560, 564 (Iowa 2006). For example, when the victim consents to a medical examination but the defendant performs a sex act instead, it is fraud in fact. *Id.* In contrast, fraud in the inducement means the defendant misrepresents the circumstances surrounding the act. *Id.* For example, when the defendant asks for permission to touch the genitals under the guise of checking for testicular cancer and performs the act in the manner he said he would for purposes of sexual gratification, it is fraud in the inducement. *See id.* at 562.

We stated in *Bolsinger* that "[f]raud in fact vitiates consent; fraud in the inducement does not." *Id.* at 564. The negative implication of this reasoning is that there is valid consent in the first instance for both types of fraud.

In terms of legal consequences, I think it is irrelevant whether the deception was to a facet of Michael Kelso-Christy's identity or to the whole of another's identity, although the latter may be more morally reprehensible. The majority's decision implicitly creates different tiers or degrees of fraud in the inducement. Yet we did not create tiers or degrees of fraud in the inducement in *Bolsinger*. Rather, in *Bolsinger*, we treated fraud in the inducement as an umbrella term that encompasses fraud in part and fraud in whole.

It is true that in *United States v. Booker*, the United States Court of Military Appeal stated, "[C]onsent to the [sex] act is based on the identity of the prospective partner." 25 M.J. 114, 116 (C.M.A. 1987). However, the court qualified this statement in a footnote "[i]n light of the two separate opinions." *Id.* at 116 n.2. In distinguishing fraud in fact from fact in the inducement, Judge Cox, the author of the lead opinion, stated, "I must acknowledge that perhaps I have treated the subject of 'fraud in the *factum*' too gently." *Id.* Judge Cox continued, "[F]or there to be actual consent, a woman must [agree] to the penetration of her body by a particular '*membrum virile*,' . . . ; it is quite irrelevant whether she knows the 'real' identity of the owner thereof." *Id.* (citation omitted).

Our caselaw recognizes the distinction between fraud in fact and fraud in the inducement. Our caselaw does not debate the question as to whether vitiating consent concerns only the act itself or also the actor. The former goes to fraud in fact while the later goes to fraud in the inducement. We drew that line in *Bolsinger*.

Assuming the logic behind the distinction between fraud in the inducement and fraud in fact is sound, the case at hand is a fraud-in-the-inducement case and, as such, Kelso-Christy's impersonation of S.P. did not vitiate S.G.'s consent. This reasoning alone undermines the majority's outcome.

Second, the fact that the court convicted Kelso-Christy of burglary in the second degree, rather than sexual abuse, does not affect the outcome of my dissent. I acknowledge the crime of sexual abuse is a general intent crime. I also acknowledge that because the court convicted Kelso-Christy of burglary, the issue is whether Kelso-Christy entered S.G.'s residence with the specific intent to commit sexual abuse.

The majority uses *State v. Ball*, 262 N.W.2d 278, 280 (Iowa 1978), to support its proposition that "it has long been the law in Iowa that consent to sex with one man cannot imply consent to sex with another" to unpack Kelso-Christy's mental state at the time he entered S.G.'s residence. In *Ball*, the defendant sought to introduce evidence of the victim's sexual conduct with other people during the year prior to the incident in which the defendant raped her. *Id.* at 279. We determined the evidence was irrelevant to the issue of whether the victim had consented to have sexual intercourse with the defendant. *Id.* at 281. In other words, we held the victim's past sexual history with third parties did not tend to show the victim consented to sexual intercourse with the defendant.

Here, Kelso-Christy is not attempting to admit evidence of S.G.'s past sexual conduct with third parties to show S.G. consented to have sexual intercourse with him. Nevertheless, the majority's expansion of *Ball* to the facts of this case makes sense when supporting the majority's conclusion that Kelso-Christy could not have believed S.G. consented to have sexual intercourse with him. However, analyzing specific intent is putting the cart in front of the horse. In the end, it ultimately does not matter what Kelso-Christy intended because the language of Iowa Code section 709.1(1) does not provide for sexual abuse by fraud or deception. I would therefore find Kelso-Christy did not commit sexual abuse pursuant to section 709.1(1). This leads me to my third point.

Iowa Code section 709.1(1) provides,

> Any sex act between persons is sexual abuse by either of the persons when the act is performed with the other person in any of the following circumstances:
>
> 1. The act is done by force or *against the will of the other*. If the consent or acquiescence of the other is procured by threats of violence toward any person or if the act is done while the other is under the influence of a drug inducing sleep

or is otherwise in a state of unconsciousness, the act is done against the will of the other.

Iowa Code § 709.1(1) (emphasis added).

As a general rule of statutory construction, we narrowly and strictly construe criminal statutes and resolve doubts in the defendant's favor. *State v. Halverson*, 857 N.W.2d 632, 637 (Iowa 2015). "To the extent there is an unresolved ambiguity, our cases require a narrow construction of the statute." *Id.* at 638. The ambiguity here is whether "against the will of the other" encompasses deception.

Our legislature has not provided for sexual abuse by deception in section 709.1(1). We must not write words into the statute. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). "In the end, a criminal statute cannot be expanded beyond those circumstances intended by the legislature to be within the scope of the statute." *State v. Meyers*, 799 N.W.2d 132, 141 (Iowa 2011).

I examine two instructive cases. In *Suliveres v. Commonwealth*, the defendant impersonated the identity of his brother—the victim's boyfriend—and had sexual intercourse with the victim. 865 N.E.2d 1086, 1088 (Mass. 2007). The victim believed she was having intercourse with her boyfriend, and had she known it was the defendant, she claimed she would not have consented. *Id.*

The court addressed whether it should overrule *Commonwealth v. Goldenberg*, 155 N.E.2d 187 (Mass. 1959), in which it had held consent to a sex act obtained through fraud or deceit was not rape. *Suliveres*, 865 N.E.2d at 1087. The court examined the rape statute, which provides,

> (b) Whoever has sexual intercourse or unnatural sexual intercourse with a person and compels such person to submit by force and against his [or her] will, or compels such person to submit by threat of bodily injury, shall be punished . . . .

*Id.* at 1088 (quoting Mass. Gen. Laws ch. 265, § 22(b)).

I acknowledge that the Massachusetts rape statute provides for "by force *and* against his [or her] will." *See id.* (emphasis added) (quoting Mass. Gen. Laws ch. 265, § 22(b)). Moreover, I acknowledge *Goldenberg* concluded "[f]raud cannot be allowed to supply the place of the force [that] the statute makes mandatory[.]" *Id.* (alteration in original) (quoting *Goldenberg*, 155 N.E.2d at 192). However, that is not the point. I rely on *Suliveres* for the principle that the judiciary may not usurp the role of the legislature to pen an outcome-driven opinion.

The court in *Suliveres* honored the doctrine of separation of powers in concluding the statute did not define rape to include fraudulently obtaining consent to sexual intercourse. *See id.* at 1090. It reasoned the legislature is aware of existing statutes and the prior state of the law when it enacts legislation. *Id.* It further reasoned the legislature did not overrule *Goldenberg* in forty-eight years although it had amended the statute three times and despite the changing attitudes and scholarship concerning rape. *Id.* Most importantly, the court reasoned, "The [l]egislature is free to amend the rape statute or create a new substantive offense to encompass the conduct at issue, as many other States have done." *Id.* "However, where the [l]egislature has chosen not to do so, '[i]t is not for this court . . . to rewrite the clear intention expressed by the statute.' " *Id.* (quoting *Commonwealth v. Leno*, 616 N.E.2d 453, 457 (Mass. 1993)). Thus, the court held under the statute, fraudulently procuring consent to sexual intercourse did not constitute rape. *Id.* at 1091.

Moreover, the court assumed the defendant committed fraud in the inducement. *Id.* at 1089. Notably, the court did not give any weight to the fact the defendant impersonated another's identity in whole, rather than just an aspect of his identity. *See id.* at 1089.

In *People v. Hough*, the defendant impersonated the identity of his twin brother—the victim's boyfriend—and deceived the victim into having sexual intercourse with him. 607 N.Y.S.2d 884, 884 (Dist. Ct. 1994). The court addressed whether the victim had actually consented to sexual intercourse with the defendant when the defendant had procured her consent by impersonating her boyfriend. *Id.* at 885. The New York sexual misconduct statute at the time provided, "A person is guilty of sexual misconduct when: . . . Being a male, he engages in sexual intercourse with a female without her consent." *Id.* at 884 (quoting N.Y. Penal Law § 130.20(1)).[2] The court read this statute in conjunction with section 130.05, which provides the definition of lack of consent. *Id.* at 885. The court reasoned the victim did not claim her lack-of-consent was based on either "forcible compulsion" or "incapacity to consent." *Id.* Instead, lack of consent stemmed from the victim's "mistaken belief resulting from [the] defendant's alleged fraud." *Id.*

Admittedly, for the crime of sexual abuse, as opposed to that of sexual misconduct, the statute provides that lack of consent encompasses "any circumstances in addition to forcible compulsion or incapacity to consent in which the victim does not expressly or impliedly acquiesce in the actor's conduct." *Id.* (citing N.Y. Penal Law § 130.05(2)(c)). The plain language of the statute reflects the New York legislature's intent to expand the definition of lack of consent. However, our legislature has not done so. Thus, because Iowa Code section 709.1(1) does not include fraud or deception, I find the logic of *Hough* applicable to this case.

In fact, the court observed, "In general, *in the absence of a statute*, where a woman is capable of consenting and does consent to sexual

---

[2]The statute now uses gender-neutral terms but the substance remains the same. *See* N.Y. Penal Law § 130.20(1) (McKinney, Westlaw through L. 2018, ch. 1–3).

intercourse, a man is not guilty of rape even though he obtained the consent through fraud or surprise." *Id.* at 886 (emphasis added). The court relied on basic rules of statutory construction to conclude the legislature had defined what constitutes lack of consent and had not included fraud or deception in the statute. *Id.* at 886–87. In affirmatively stating "[c]ourts should avoid judicial legislation[,]" the court deferred to the language of the applicable statutes. *Id.* at 887. The court reasoned, "It is a basic tenet of statutory law that where the legislature fails to include a matter within the scope of an act, *its exclusion was intended.*" *Id.* at 886 (emphasis added). Thus, the court concluded the legislature intended to exclude fraud or impersonation cases from the definition of lack of consent, which is a necessary element to prove sexual misconduct under section § 130.20(1). *Id.* at 887.

Iowa Code section § 709.1(1) does not provide for sexual abuse by deception. If the legislature wants to subsume fraudulently obtaining consent to sexual intercourse under the statutory definition of sexual abuse, then it knows how to do so. For example, other states have codified fraudulent inducement as a form of rape or sexual misconduct. *See, e.g.,* Ala. Code § 13A-6-65(a)(1) (Westlaw current through Act 2018-124, Act 2018-126 through Act 2018-151, and Act 2018-153 through Act 2018-392) (stating "[a] person commits the crime of sexual misconduct if" the man has sexual intercourse with a woman "where consent was obtained by the use of any fraud or artifice"); Cal. Penal Code § 261(a)(5) (West, Westlaw through ch. 10 of 2018 Reg. Sess.) (stating rape constitutes "sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [w]here a person submits under the belief that the person committing the act is someone known to the victim other than the accused, and this belief is induced by any artifice, pretense, or concealment

practiced by the accused, with intent to induce the belief"); Kan. Stat. Ann. § 21-5503(a)(4)–(5) (West, Westlaw through 2018 Reg. Sess.) (providing rape constitutes "sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender"); Mich. Comp. Laws Ann. § 750.520b(1)(f)(*v*) (West, Westlaw through P.A. 2018, No. 111 and 114) (providing sexual penetration of another "through concealment" constitutes criminal sexual conduct in the first degree); Okla. Stat. Ann. tit. 21, § 1111(6) (West, Westlaw through ch. 65, 2018 2d Reg. Sess.) (providing rape constitutes sexual intercourse in which "the victim submits to sexual intercourse under the belief that the person committing the act is a spouse, and this belief is induced by artifice, pretense, or concealment practiced by the accused or by the accused in collusion with the spouse with intent to induce that belief"); Tenn. Code Ann. § 39-13-503(a)(4) (West, Westlaw through 2018 2d Reg. Sess.) (stating "sexual penetration [that] is accomplished by fraud" constitutes rape).

The majority should decide the instant case on the language of the statute, not on policy. We are not in a position to engage in judicial legislation. Moreover, we are not in a position to determine the wisdom and propriety of the legislature's actions on matters within its authority. Post-*Bolsinger*, the legislature did not amend section 709.4(1), which defines sexual abuse in the third degree, to include fraud in the inducement. Had the legislature intended to criminalize third-degree sexual abuse by fraud in the inducement, it would have amended section 709.4(1) after we concluded in *Bolsinger* that fraud in the inducement does not vitiate consent and therefore fraudulently procuring a sex act does not constitute sexual abuse in the third degree. *See* 709 N.W.2d at 564.

As a caveat, I emphasize that I am not saying the defendant did not commit a wrongful act. *See Hough*, 607 N.Y.S.2d at 887. Rather, because the allegations of fact do not contain all the necessary elements to find Kelso-Christy guilty of sexual abuse, the State could have charged the defendant with another crime. *See id.*

Lastly, the majority's holding stands for the proposition that misrepresentation as to the whole in the course of seduction to achieve sexual intercourse constitutes sexual abuse because the misrepresentation may be material to the victim. Specifically as to fraud in the inducement, say for example, John meets a woman on the Internet supposedly named Jane. Jane represents herself on the Internet as a rich business owner who can advance John's career if they have sex. In reality, Jane is really Cindy who is unemployed and likes to have casual sex with numerous partners. Cindy has been impersonating the identity of Jane to procure sex. John agrees to have sexual intercourse with Cindy based on Cindy's misrepresentations. Based on the majority's holding, fraud in the inducement does vitiate John's consent and permits the State to prosecute Jane for sexual abuse. Again, I emphasize such a holding is inconsistent with that of *Bolsinger* for the reasons I have already stated in my dissent.

Accordingly, I would reverse the conviction.

Appel, J., joins this dissent.