# IN THE SUPREME COURT OF IOWA

No. 19–0981

Submitted November 17, 2020—Filed February 19, 2021

**STATE OF IOWA,**

>Appellee,

vs.

**MICHAEL BUMAN,**

>Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Plymouth County, Steven J. Andreasen, J.

The State seeks further review of the court of appeals reversal of defendant's conviction of wanton neglect of a resident in a health care facility. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT CONVICTION REVERSED AND CASE REMANDED.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Priscilla E. Forsyth (argued), Sioux City, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines (argued), Assistant Attorney General, and Darin J. Raymond, County Attorney, for appellee.

**APPEL, Justice.**

In this case, Michael Buman appeals his conviction following a jury trial of the offense of wanton neglect of a resident of a heath care facility in violation of Iowa Code section 726.7(1) and subsection (3) (2016). The criminal charge arose out of the alleged failure of Buman to properly ensure that a facility resident received medications as ordered by the resident's physician. During the trial the State introduced evidence regarding the standard of care in the nursing profession, and the trial court provided the jury with instructions related to the use of the standard of care in the case.

Buman claims on appeal that the admission of the professional standards and the subsequent instruction were improper and served only to confuse the jury in its deliberations. A divided court of appeals agreed with Buman, reversed his conviction, and remanded for a new trial. We granted the State's application for further review.

For the reasons stated below, we reverse Buman's conviction and remand the matter to the district court for further proceedings.

### I. Background Facts and Proceedings.

Defendant Michael Buman has been in the medical field for several decades. He became an emergency medical technician in 1977 but moved into nursing, becoming a registered nurse in 2004.

In November 2015, Buman began working at the Pride Group Residential Care Facility (Pride Group Facility) in Le Mars, Iowa. Buman worked the night shift at the Pride Group Facility. His duties included distributing medicine to residence and handling direct care with residents. Buman worked at the Pride Group Facility during the relevant dates at issue in this case in October 2016.

In October 2016, Joe Lenz was a resident of the Pride Group Facility who had been at the facility for more than twenty years. Lenz suffered from what was diagnosed as chronic paranoid schizophrenia with catatonic features, obsessive compulsive disorder, and mild intellectual disability.

At the Pride Group Facility, an off-site psychiatrist or medical doctor issued doctor's orders for medications. The prescriptions were filled by L & M Pharmacy. The pharmacy delivered a two-week supply of medication. The pharmacy placed the medications in a locked room where the medication was then separated and organized for distribution by placing the medication on trays that had individual drawers for each medication the resident was taking.

Lenz had been prescribed a number of medications, including Clozapine. Another nurse testified that the Clozapine was available to be administered to Lenz on October 12 and 13, but on October 15, the Clozapine was not there. The nurse reported to the day-shift nurse that the medication was missing so that the day-shift nurse could contact the pharmacy. She then marked "NA" on the medication administration record for Lenz on October 15 and also on October 16 when the medication was still not there. On October 17, the initials of "AW" appeared on the Lenz medical record. AW is another nurse who did not testify and there is no indication of whether AW's initials signified administration of clozapine on October 17.

On October 18, Buman testified that he initialed Lenz's medical record, indicating that he administered the Clozapine, but he did so automatically and that, in fact, the Clozapine was not present to be administered. According to Buman, Lenz asked why he had not been

receiving the drug, and Buman in response searched to see if the medication was misplaced. He could not find the drug.

After talking with Lenz and looking at the records, Buman testified that he concluded that the medication must have been discontinued and that no one had marked the chart indicating the discontinuation. According to Buman, he entered the notation "DC'd" on the chart. According to an administrator at the facility, by marking the record "DC," other medication passers would not administer the drug, but the marking of the medication record with a "DC" would not affect the pharmacy's continued delivery of the medication. The record contained no evidence for whether the Clozapine had been delivered to Lenz after Buman notated "DC" on the medical record.

On October 27, Lenz had a psychotic episode. He believed a bomb went off in the building and that the building was on fire—eventually running out into the night. With the assistance of law enforcement, he was taken to the hospital. Lenz's physician assistant testified at trial that he believed that Lenz was not receiving his Clozapine and that this led to the October 27 event.

During the trial, the State introduced, over Buman's objection, a portion of the Iowa Administrative Code related to the practice of nursing as Exhibit 15. Specifically, Exhibit 15 provided, in relevant part:

> The registered nurse shall recognize and understand the legal implications of accountability. Accountability includes but need not be limited to the following:
>
> . . . .
>
> *e.* Executing the regimen prescribed by a physician. In executing the medical regimen as prescribed by the physician, the registered nurse shall exercise professional judgment in accordance with minimum standards of nursing practice as defined in these rules. If the medical regimen prescribed by the physician is not carried out, based on the registered

nurse's professional judgment, accountability shall include but need not be limited to the following:

(1) Timely notification of the physician who prescribed the medical regimen that the order(s) was not executed and reason(s) for same.

(2) Documentation on the medical record that the physician was notified and reason(s) for not executing the order(s).

The district court also gave the jury an instruction related to Exhibit 15. Specifically, Instruction No. 17 provided:

In accordance with the standards in the Iowa Administrative Code, a registered nurse is required to follow a medical regimen prescribed by a physician. If a medical regimen prescribed by a physician is not carried out by a registered nurse, the registered nurse is required to timely notify the physician who prescribed the medical regimen and also document on the medical record that the physician was notified and the reason for not executing the physician's order. A violation of this standard, in and of itself, is not a criminal act. You may consider this standard only in determining whether the State has proven beyond a reasonable doubt the elements of the charge set forth in Instruction 15.

The jury found Buman guilty of wanton neglect of a resident of a health care facility but found that Buman's actions or omissions did not cause serious injury to Lenz.

Buman appealed his conviction. On appeal, he claims that Exhibit 15, which related to professional nursing standards, was improperly admitted into evidence. Buman further claims that Instruction No. 17 was erroneous because it misled and confused the jury. Finally, Buman claims there was insufficient evidence to support the verdict.

We transferred the case to the court of appeals. In a divided opinion, the court of appeals reversed Buman's conviction and remanded the case to the district court. For the reasons expressed below, we affirm the court of appeals decision and remand the case for a new trial.

## II. Standard of Review.

"We review evidentiary rulings for abuse of discretion." *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). "We reverse a ruling that the district court makes in the balancing process . . . only if the district court has abused its discretion." *Id.* (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) (en banc)).

"[W]e review challenges to jury instructions for correction of errors at law." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016) (quoting *Anderson v. State*, 692 N.W.2d 360, 363 (Iowa 2005)). We reverse erroneous jury instructions when prejudice results. *State v. Coleman*, 907 N.W.2d 124, 138 (Iowa 2018). But we presume errors in jury instructions are prejudicial "unless the record affirmatively establishes there was no prejudice." *State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010).

"We review the sufficiency of the evidence for correction of errors at law." *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). "We view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017) (quoting *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005)). We evaluate the sufficiency of the evidence by considering whether the record contains substantial evidence to support conviction. *Kelso-Christy*, 911 N.W.2d at 666. "Substantial evidence exists when the evidence 'would convince a rational fact finder the defendant is guilty beyond a reasonable doubt.'" *Kelso-Christy*, 911 N.W.2d at 666 (quoting *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011)).

## III. Discussion.

**A. Positions of the Parties.** On appeal, *Buman* maintains that the admission of Exhibit 15 was contrary to Iowa Rule of Evidence 5.403. In

particular, he attacks the language of the exhibit which provides: "The registered nurse shall recognize and understand the legal implications of accountability. Accountability includes but need not be limited to the following . . . ." He maintains that the standard of accountability in the professional standard is not the same as the standard of "knowingly act[ing] in a manner likely to be injurious" to a resident under Iowa Code section 726.7 and thus could confuse the jury. A jury, according to Buman, could have easily believed that if a nurse does not comply with the professional standards, they are guilty of the offense.

Buman also points to language in Exhibit 15 that describes a range of activities such as performing and supervising activities, assigning and supervising persons, using professional judgment, and delegating tasks. None of these activities, according to Buman, were issues at trial. Further, Buman argues that he simply made a clerical notation and did not discontinue the medication.

Buman further takes on Instruction No. 17. According to Buman, the instruction was confusing in the context of the evidence adduced at trial. While Instruction No. 17 states that a violation of a standard is not a criminal act, Exhibit 15 has language emphasizing accountability for violation of the standards. But nowhere do the instructions zero in on the relevance of the standards to any element of the offense. So the standards, according to Buman, emphasize "accountability" but not how exactly the standard of "accountability" relates to the criminal charge in the case.

Finally, Buman claims there was insufficient evidence to support the verdict. Buman maintains that there was no evidence that when he marked "DC'd" on the chart, he knowingly acted in a manner that would likely be injurious to Lenz. According to Buman, the evidence showed that the medicine was not there and that Buman told the director of nursing it

was missing. There was no evidence that the pharmacy ever saw the notation nor discontinued sending the medication. Therefore, there was not substantial evidence to support the jury verdict.

The State responds by noting that Iowa Rule of Evidence 5.401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and is "of consequence in determining the action." Citing the New York case *People v. Speringo*, the State maintains that the evidence of the standard of care of nurses in Exhibit 15 was relevant evidence to show "a risk attendant with that act." 686 N.Y.S.2d 8, 9 (N.Y. App. Div. 1999) (Mem.). Further, the State points out that other witnesses at trial testified about the standard of care expected of a nurse dispensing medication and described the proper protocol for nurses to utilize when a medication is unavailable. The State emphasizes that the probative value of Exhibit 15 was not outweighed by its prejudicial effect. The jury, the State notes, was specifically instructed that a violation of the nursing standard of care did not equate with a criminal act.

Turning to the instructions, the State emphasizes that the jury was properly instructed on the elements of the offense in Instruction No. 15. Among the elements, the instruction clearly required that in order to convict Buman, the State was required to show that he "knowingly acted in a manner likely to be injurious to the physical or mental welfare of Joseph Lenz." The State observes that Instruction No. 15A provided that for Buman to have acted knowingly means "he had a conscious awareness that he was acting in a manner likely to be injurious to the physical or mental welfare of Joseph Lenz." These instructions, according to the State, accurately described the law for the jury to apply.

On the question of substantial evidence, the State asserts that the evidence at trial showed that a registered nurse would not fail to administer a prescribed medication simply because it was not present. The State maintains the evidence showed that when a drug was not present, a nurse at the facility was required to notify a nursing supervisor or physician.

**B. Merits.** We begin with a brief review of the applicable statute. Iowa Code section 726.7 provides that "[a] person commits wanton neglect of a resident of a health care facility when the person knowingly acts in a manner likely to be injurious to the physical or mental welfare of a resident of a health care facility." In *State v. McKee*, we upheld the statute from a vagueness attack. 392 N.W.2d 493, 495, (Iowa 1986).

We think Buman is correct when he states that the admission of Exhibit 15, when coupled with Instruction No. 17, posed a serious risk of misleading or confusing the jury. The language of "accountability" in Exhibit 15 is ominous and creates a danger that the jury gave undue emphasis to potential violation of professional standards in determining his liability under the criminal statute. It is true, of course, that Instruction No. 17 stated that proving a violation of the professional standards in Exhibit 15 did not amount to a crime, but if this is true, what was the jury to make of the accountability language? And, by combining the accountability language with substantive professional standards in the exhibit, the danger exists that the jury would regard this case primarily as one based on violation of professional standards rather than on the higher level of proof required by the criminal offense. Prejudice occurs when evidence prompts a jury to make a decision on an improper basis. *State v. Newell,* 710 N.W.2d 6, 20 (Iowa 2006); *Waits v. United Fire & Cas. Co.,* 572 N.W.2d 565, 569–571 (Iowa 1997).

In context, then, we find that the introduction of the totality of Exhibit 15, particularly its language regarding accountability as well as its irrelevant passages, created substantial confusion of issues and should have been excluded under Iowa Rule of Evidence 5.403. Under this rule, relevant evidence may be excluded if any probative value of the evidence is "substantially outweighed by a danger of . . . confusing the issues, [or] misleading the jury." Iowa R. of Evid. 5.403; *see also United States v. Robertson*, 875 F.3d 1281, 1295–97 (9th Cir. 2017) (excluding admission of entire U.S. Army Corp of Engineers Guidebook in Clean Water Act case because of the danger of confusing issues and misleading jury as the standards in the manual were not the same as those in the jury instructions), *cert. granted and judgment vacated and case remanded*, 139 S. Ct. 1543 (2019); *Torres-Arroyo v. Rullán*, 436 F.3d 1, 8 (1st Cir. 2006) ("District courts have the right—indeed, the obligation [to exclude evidence in order] to guard against juror confusion . . . ."); *United States v. Gibson*, 568 F.2d 111, 112 (8th Cir. 1978) (per curiam) (holding that the issue of defendant's violation of methadone program regulations was a collateral matter to witness impeachment and could be excluded).

We recognize that we ordinarily defer to the district court in doing the balancing under Iowa Rule of Evidence 5.403. *See Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (en banc). But here, the probative value of the accountability language in Exhibit 15 was indisputably low. The State certainly had no need for the evidence. It took the jury far afield from the criminal charge at hand. And, there was a real danger that Buman could have been found guilty by a jury that focused on the accountability provisions of Exhibit 15 and not on the elements of the criminal offense. A demand for accountability in the nursing profession should not be permitted to cloud the issues of criminal liability

in this case.    In our view, the language in Exhibit 15 regarding accountability had little probative value and yet had great potential to confuse or mislead the jury in a case where the real issues were highly contested.   We conclude the accountability language should have been excluded.

Like the court of appeals majority, we do not broadly hold that evidence of professional standards are never admissible in a criminal case. But if the professional standards are admitted, the admission must be appropriately limited and controlled by the court to ensure that a criminal matter requiring the highest standards of proof and a high degree of mens rea does not morph into a civil matter over whether a defendant complied with a professional accountability standard.

That said, we are not prepared to say that there was insufficient evidence to support the verdict.   Buman had been a registered nurse for ten years and worked at the Pride Group Facility for nearly one year.   Lenz suffered from paranoid schizophrenia and had been prescribed the antipsychotic medication Clozapine.   On October 18, Buman initialed that he had administered the Clozapine to Lenz despite not actually doing so. Lenz asked Buman why he had not received the Clozapine.   After a short investigation and talk with Lenz, Buman concluded that the Clozapine administration to Lenz had been discontinued—marking "DC'd" on the medical record.   The notation of "DC'd" meant that other drug passers would not distribute the Clozapine to Lenz.   Finally, there was evidence that as a result of the failure to administer Clozapine, Lenz suffered a psychotic episode.

It could be inferred from this evidence that Buman knew marking "DC'd" meant that the Clozapine would not be given to Lenz.   And, it can be further inferred that the discontinuation of the Clozapine drug therapy

could cause harm to Lenz—namely, a potential psychotic episode. From the evidence, and its implications, viewed in the light most favorable to the State, there is substantial evidence to demonstrate that a rational fact finder could rest a conviction for wanton neglect of a resident of a health care facility beyond a reasonable doubt.

But the jury could have drawn a different conclusion. In this case, the jury was disserved by the introduction of confusing and misleading evidence and the court's jury instructions did not mitigate the problem.

**IV. Conclusion.**

For the above reasons, we reverse Buman's conviction and remand the matter to the district court for further proceedings.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT CONVICTION REVERSED AND CASE REMANDED.**