# IN THE COURT OF APPEALS OF IOWA

No. 17-0727
Filed September 26, 2018

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**BRYCE LADARIS GULLY,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Webster County, Kurt L. Wilke, Judge.

      Bryce Gully appeals his convictions of several drug- and gun-related crimes and the sentences imposed. **AFFIRMED.**

      Charles J. Kenville of Kenville Law Firm, PC, Fort Dodge, for appellant.

      Thomas J. Miller, Attorney General, and Kevin Cmelik and Sharon K. Hall, Assistant Attorneys General, for appellee.

      Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Bryce Gully appeals his convictions of several drug- and gun-related crimes and the sentences imposed. He contends: (1) the district court erred in denying his motion to suppress evidence obtained pursuant to a search warrant because the warrant application lacked probable cause; (2) the district court abused its discretion in denying his motions for a mistrial; (3) there was insufficient evidence to support his convictions and the district court therefore erred in denying his motions for judgment of acquittal;[1] (4) the sentences imposed amount to cruel and unusual punishment because his prior convictions supporting sentencing enhancement were committed when he was a juvenile; and (5) his trial counsel rendered ineffective assistance in failing to object to the racial makeup of the jury pool.

**I.    Background Facts and Proceedings**

A.    Suppression Record

The following facts can be gleaned from the suppression record. In the early morning hours of November 27, 2015, a shooting occurred outside a pub in Fort Dodge. Upon investigation, the Fort Dodge Police Department identified Gully, Torre Mosley, and Kwane Wheat as suspects in the shooting. Detective Tom Steck applied for a search warrant for the residences in which he believed

---

[1] Gully intertwines this argument with a contention that the verdict was contrary to the weight of the evidence and the district court therefore erred in denying his motion for a new trial. Gully states "[t]hese issues are combined . . . because the evidence that established there was insufficient evidence for conviction also demonstrates that the verdict was contrary to the weight of the evidence." However, the substance of the argument as a whole is only that there was insufficient evidence to show he possessed the subject firearms and drugs. Gully provides no substantive argument on his weight-of-the-evidence claim. We will therefore only consider the argument under a sufficiency-of-the-evidence rubric.

the three suspects primarily resided to search for evidence related to the shooting. Based on the information available and prior investigations, Steck believed Gully primarily resided with his girlfriend, Krystal Prince, and their two children in a residence located at 348 Avenue M West, Fort Dodge. In relevant part, the warrant application provided the following as to Gully's residence:

> Through conversations with other officers, confidential informants, citizens, and through prior personal involvement and investigation by this officer it is known that GULLY commonly stays with and lives with his girlfriend, KRYSTAL [] PRINCE . . . at the residence of 348 Ave M West in Fort Dodge . . . . This officer on multiple occasions has personally seen GULLY coming and going from this specific residence and has seen vehicles GULLY drives stay overnight at the residence on multiple times along with PRINCE operating vehicles GULLY drives and vi[ce] versa. . . . PRINCE and GULLY have been involved in a[n] intimate relationship with one another for over four years and they have two children together. Officers have responded to this specific residence multiple times for GULLY. . . . GULLY lists on his Iowa drivers license information that he lives at [a] residence . . . in Marshalltown but through multiple investigations this officer has personally been involved GULLY does not live in Marshalltown any longer. GULLY has also been known to tell officers that he lives at the residence of 1128 10th Ave SW in Fort Dodge with his mother and grandmother. Through multiple prior investigations this officer has personally been involved in it is known by this officer and others that GULLY does not live at this residence nor does he have a bedroom at the residence. . . . It should also be noted that this officer personally knows that GULLY's address he has listed on his current Iowa driver's license is an old address and he has not changed in at least several months to a year.
>  . . . .
>  . . . . It is also known that the three try to disguise their addresses and stay at multiple residences in attempts to evade law enforcement but each commonly reside with the previously listed girlfriends at the previously mentioned residences. Although the three do stay at other locations the three primary residences for them have been previously identified within this affidavit.

Attached to the warrant application were references to two anonymous tips received by law enforcement, one advising law enforcement to check the suspects' "baby mommies houses," and the other specifically advising officers to check

Prince's house. Steck did not request a search warrant for any of the other residences Gully was potentially associated with. The warrant application was granted.

B.     Trial Evidence

Upon the evidence presented at trial, a reasonable jury could make the following factual findings. Upon the grant of the warrant application, local law enforcement assembled to execute the warrant on the residence located at 348 Avenue M West. Upon executing the search warrant between 7:00 and 8:00 a.m., officers found Gully and his two young children in the home. After officers secured the residence, Sergeant Luke Fleener of the Webster County Sheriff's Department searched the main level of the residence. In the kitchen area, Fleener found a glass jar containing about twenty grams of marijuana, 3.16 grams of cocaine, and 2.34 grams of cocaine base (crack cocaine); a large number of plastic baggies consistent with the sale of narcotics; and a small scale commonly used "to weigh out exact measurements of narcotics."

Lieutenant Matthew Lundberg of the Fort Dodge Police Department searched the basement of the residence. As a part of his search, Lundberg checked the area above the basement furnace, where he ultimately found a dark-colored duffel bag or backpack. During their inventory of the bag, Lundberg and Fleener found three handguns, loose ammunition, a plastic bag containing more than twenty grams of cocaine, and more than six pounds of marijuana in brick form. Lundberg and Fleener testified to their assessments that, due to the lack of dust and other debris on the dark-colored bag, it could not have been stored above the furnace for very long. No drug paraphernalia consistent with personal use of the

drugs was found in the residence or on Gully's person. Officers also seized Gully's cellular phone. A forensic examination was conducted as to Gully's phone and text messages extracted from the phone indicated Gully was involved in the sale of marijuana and cocaine in the weeks prior to the execution of the search warrant.

According to Prince's testimony, she and Gully were not in a romantic relationship at the time of the above events, but his presence at her home at this time was a regular occurrence, despite the fact that Gully lived with his mother. Prince had to be to work by 6:00 a.m. on the morning of November 27, and she had previously arranged for Gully's mother to care for her and Gully's children that day. Early that morning, however, as Prince was packing the children's items for the day, Gully showed up at the residence and advised he could watch the children, who were still asleep, upon which Prince agreed and left for work.

In August and September of 2015, Prince's younger brother, Nick Dayton, was living in Prince's basement. When shown pictures of the dark-colored bag, its contents, and the mason jar during her testimony at trial, Prince stated she had never seen any of those items before. She indicated none of the said items could have belonged to Dayton, stating, "He's just . . . not that kind of a kid." Prince specifically testified that in the two weeks prior to the execution of the search warrant on her home, she knew Gully to be involved in the sale of drugs.

A number of the seized items were sent to the state crime lab for fingerprint and DNA analysis. Four latent fingerprints belonging to Gully were found on the mason jar found in the kitchen. Four latent fingerprints, two of which belonged to

Gully,[2] were found on one of the two Walmart sacks that contained the bricks of marijuana found in the dark-colored bag in the basement. Two latent fingerprints belonging to Gully were found on the plastic "Glik's" bag that contained two of the firearms found in the bag in the basement. The criminalist who analyzed the prints explained that it is possible to transfer fingerprints from one item to another, but opined none of the fingerprints he found on these items were transferred. The DNA profile obtained from one of the firearms that was tested contained a mixture of DNA from at least three individuals. Gully, as well as fewer than one out of ten unrelated individuals, was identified as a possible contributor to the mixed profile.

C.      Proceedings

Gully was charged by trial information with the following crimes: possession of cocaine with intent to deliver, possession of cocaine base with intent to deliver, possession of marijuana with intent to deliver, three counts of felon in possession of a firearm, and two counts of failure to affix a drug-tax stamp.[3] As to all three possession-with-intent-to-deliver charges, the State additionally alleged that, during the commission of the crimes, Gully was in the immediate possession or control of a firearm. *See* Iowa Code § 124.401(1)(e) (2015). As to the cocaine and cocaine-base possession charges and the tax-stamp violations, Gully was alleged to have been a second or subsequent offender. *See id.* § 124.411. Gully was charged as a habitual offender as to all eight counts. *See id.* § 902.8.

---

[2] The other two fingerprints were run through the Automated Fingerprint Identification System (AFIS), a nationwide database containing the fingerprints of persons arrested for certain crimes. The other fingerprints were not identified by AFIS. Of note, Dayton's fingerprints have been entered into AFIS.

[3] Gully was also initially charged with criminal gang participation. That charge was subsequently severed upon agreement by the parties.

Gully filed a pretrial motion to suppress the evidence obtained pursuant to the search warrant, contending, among other things, "No basis existed for granting the warrant for the residence in which the state alleged [he] resided." Following a hearing, the court denied the motion, concluding the magistrate had a reasonable basis for concluding probable cause existed to issue the search warrant.

Ultimately, a jury found Gully guilty as charged. The issue of prior convictions and sentencing enhancement was considered by the court, and Gully stipulated he was previously convicted of willful injury causing bodily injury in March 2010 and two counts of possession of marijuana with intent to deliver in April 2013, all class "D" felonies.

Thereafter, Gully filed a motion in arrest of judgment and a motion for a new trial. In his motion in arrest of judgment, Gully contended the evidence was insufficient to support his conviction and the court's use of his prior convictions for sentencing-enhancement purposes amounted to cruel and punishment because he was a juvenile at the time he committed those crimes. In his motion for a new trial, Gully repeated his sufficiency-of-the-evidence argument and additionally contended, among other things, juror misconduct occurred during the trial. The court denied the motions and proceeded to sentencing.

As to sentencing, Gully repeated his argument that the court's use of his prior convictions for sentencing-enhancement purposes amounted to cruel and punishment because he was a juvenile at the time he committed those crimes. The court rejected the argument and sentenced Gully to three concurrent terms of incarceration not to exceed thirty years for the possession-with-intent-to-deliver charges; three concurrent terms of incarceration not to exceed fifteen years for the

felon-in-possession-of-a-firearm charges; and two concurrent terms of incarceration not to exceed fifteen years for the drug-tax-stamp charges. The court ordered the concurrent drug-possession sentences and concurrent firearms sentences to be served consecutively for a total term of incarceration not to exceed forty-five years. The court suspended the sentences for the drug-tax-stamp charges and, if ever served, ordered them to be served concurrently with one another and with all other sentences.

As noted, Gully appeals. Additional facts will be set forth below as are relevant to the issues raised on appeal.

## II. Motion to Suppress

Gully argues the district court erred in denying his motion to suppress evidence obtained pursuant to the search warrant, contending the warrant lacked probable cause. We review a challenge to a search warrant for an alleged lack of probable cause de novo, based on the totality of the circumstances. *See State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015). "[W]e do not make an independent determination of probable cause," we merely determine "whether the issuing judge had a substantial basis for concluding probable cause existed." *Id.* (quoting *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997)).

The United States and Iowa Constitutions protect against unreasonable searches and direct that no warrants shall issue without probable cause. U.S. Const. amend. IV; Iowa Const. art. I, § 8; *see McNeal*, 867 N.W.2d at 99. The test to determine whether there is probable cause to issue a search warrant is as follows:

> [W]hether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there. Probable cause to search requires a probability determination that (1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched.

*McNeal*, 867 N.W.2d at 99 (internal quotation marks omitted) (quoting *Gogg*, 561 N.W.2d at 363). We interpret warrant applications "in a common sense, rather than a hypertechnical, manner." *See id.* at 100 (quoting *State v. Shanahan*, 712 N.W.2d 121, 132 (Iowa 2006)). "[W]e draw all reasonable inferences to support the judge's finding of probable cause and give great deference to the judge's finding"—"[c]lose cases are decided in favor of upholding the validity of the warrant." *Id.* (first alteration in original) (quoting *Gogg*, 561 N.W.2d at 364).

Gully specifically argues the warrant application lacked probable cause because the information was stale and the application contained information from anonymous tipsters that was not specifically found to be credible by the issuing magistrate. But Gully's argument rests on his implication that the complained of information in the warrant application was the only information provided therein. As detailed above, Detective Steck's warrant application, although it did reference the anonymous tips and specific instances of Gully's connection to the residence in previous years, was largely based upon his "prior personal involvement and investigation." In the warrant application, Steck explained he had personally observed Gully coming to and going from Prince's residence "on multiple occasions" and he saw Gully's vehicle parked at the residence overnight "multiple times." Steck also related that he personally investigated Gully's living arrangements and, based upon that investigation, he determined Gully primarily

resided with Prince. Steck also pointed out that he knew Gully tries to disguise his address and stay at multiple residences in attempts to evade law enforcement, but he commonly resided with Prince.

Even if we were to excise the complained of information—the information obtained from anonymous tipsters and the references in the warrant application concerning sightings of Gully at the residence in previous years—the issuing magistrate still had a substantial basis for concluding there was probable cause that Gully resided with Prince and the evidence sought in relation to the early morning shooting could be located in the place to be searched, Prince's residence. *Cf. id.* at 105 (excising complained of information from a warrant application and determining a substantial basis for a probable cause finding existed). Based upon the totality of the circumstances, and affording great deference to the probable cause finding, we conclude the issuing magistrate had a substantial basis for concluding probable cause existed to search Prince's residence.

In oral argument, Gully additionally contended the warrant application failed to establish a sufficient nexus between the evidence sought in relation to the shooting and Prince's residence. *See id.* at 103 (noting "a nexus must be established between the items to be seized and the place to be searched"). He asserts that because the warrant application stated the primary witness identified Mosley as the shooter, the nexus between the evidence—the gun used in the shooting—and Gully's primary residence was lacking. However, the warrant application clearly indicated two separate firearms, a 9 millimeter handgun and a .40 caliber handgun, were discharged from two separate locations in the course of the shooting. Although the primary witness did not observe Gully fire any shots,

the witness's report to officers placed Gully where the .40 caliber shell casings were found. The warrant additionally noted Gully, Mosley, and Wheat commonly attempt to conceal evidence relating to crimes committed by one another by hiding it in each others' residences. We find a sufficient nexus between the evidence sought and the place to be searched.

We affirm the district court's denial of Gully's motion to suppress.

## III. Mistrial Motions

Next, Gully argues the district court abused its discretion in denying his motions for mistrial. We review the district court's denial of a mistrial motion for an abuse of discretion. *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). An abuse of discretion occurs when the court "exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable." *State v. Wickes*, 910 N.W.2d 554, 564 (Iowa 2018) (quoting *State v. Hill*, 878 N.W.2d 269, 272 (Iowa 2016)). Trial courts have broad discretion in ruling on motions for a mistrial. *State v. Brown*, 397 N.W.2d 689, 699 (Iowa 1986). This is because "they are present throughout the trial and are in a better position than the reviewing court to gauge the effect of the matter in question on the jury." *State v. Jirak*, 491 N.W.2d 794, 796 (Iowa Ct. App. 1992). "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (quoting *State v. Piper*, 663 N.W.2d 894, 902 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 550–51 (Iowa 2010)). "Ordinarily, abuse of discretion is found upon the denial of a mistrial only where there is no support in the record for the trial court's determination." *Jirak*, 491 N.W.2d at 796.

A.      First Mistrial Motion—"Shooting" Reference

In his pretrial motion in limine, Gully requested the court to disallow any evidence concerning the shooting which led to the search warrant.  The court granted the request.  The testimony of the State's first witness, Lieutenant Lundberg, included the following:

> Q. Okay.  So on November 27, 2015, you were contacted . . . to assist in the execution of multiple search warrants?
> A. Yes.
> Q. And the 348 Avenue M West, was that one location?
> A. Yes, that was one—That was the third location.
> Q. Okay.  If you know, what was the search warrant at that location regarding?  A. There was a shooting—

Defense counsel promptly objected and a bench conference was had, after which the court excused the jury.  Gully ultimately moved for a mistrial.  The court noted, "We're close to a mistrial," but ultimately denied the mistrial motion, choosing instead to instruct the jury to disregard the testimony.  The court promptly instructed the jury as follows:

> Ladies and gentlemen, before we just took this last break, the question was asked by the State's attorney and an answer was given by the witness.  I don't know if you caught the answer or not, but I'm going to tell you that it is stricken from the record.  You should not consider it.  It is irrelevant and has no bearing on this case whatsoever.
> And as I mentioned in the admonition that I read to you at the beginning, there might be times when I will tell you that there are certain things that should be stricken from your consideration.  This is one of them.

Gully argues the testimony "appealed to the jury's instincts to punish [him] and the nature of the testimony was of such a nature to prejudice him."  As the supreme court has noted, however, "[c]autionary instructions are sufficient to mitigate the prejudicial impact of inadmissible evidence 'in all but the most extreme cases.'"

*Plain*, 898 N.W.2d at 815 (quoting *State v. Breitbach*, 488 N.W.2d 444, 448 (Iowa 1992)). This is not one of those extreme cases. There was only a single reference to the shooting in the course of a three-day trial and the testimony was promptly stricken from the record. *Compare id.* (finding cautionary instruction was sufficient to mitigate prejudicial impact of inadmissible evidence where "the evidence was not extensive and the district court properly addressed the matter"), *and Breitbach*, 488 N.W.2d at 449 (concluding cautionary instruction negated prejudice where "the challenged testimony was rather brief in duration and promptly followed by an appropriate cautionary instruction"), *with State v. Belieu*, 288 N.W.2d 895, 901 (Iowa 1980) (finding a cautionary instruction to be inadequate to mitigate prejudice where the challenged evidence was not "a brief, inadvertent reference to prior criminal activity, promptly stricken from the record," but instead "involved numerous references to other alleged crimes which remained part of the record"). Furthermore, appellate courts "presume juries follow the court's instructions." *Hanes*, 790 N.W.2d at 552; *accord Bruton v. United States*, 391 U.S. 123, 135 (1968) ("It is not unreasonable to conclude that . . . the jury can and will follow the trial judge's instructions to disregard such information."). Giving effect to that presumption, we conclude Gully has not met the heavy burden of demonstrating the district court abused its discretion in denying his motion for a mistrial. *See Brown,* 397 N.W.2d at 699 ("Generally, trial court's quick action in striking the improper response and cautioning the jury to disregard it, coupled, when necessary, with some type of general cautionary instruction, will prevent any prejudice. A defendant who asserts these actions were insufficient bears the

heavy burden of demonstrating a clear abuse of discretion on the part of trial court."). We affirm the district court's denial of the mistrial motion.

B.      Second Mistrial Motion—Juror Misconduct

At the beginning of trial, the court admonished the jurors that they were not allowed to communicate with one another or with third parties about the case. The court also advised the jury it was to keep an open mind and not form or express an opinion until it retired to the jury room for deliberations. The morning after the State rested, Gully's counsel advised the court that Gully's girlfriend was in the possession of "text messages which purport to be from one of the jurors directly relating to the case" that indicated "that several of the jurors ha[d] already found [Gully] guilty." The text message exchange that occurred between the juror and a third party included the following:

> JUROR: Been here since 9 today. Yesterday i was here from 8 to 3:30.
> THIRD PARTY: How's it looking for him guilty or not guilty? What u think?
> JUROR: Theyre all saying guilty. Krystal was in here testifying against him a bit ago.

Upon questioning by the court, Gully's girlfriend was unable to identify which juror sent the text messages. The girlfriend advised she could find out which juror sent the text messages, and the court allowed her the opportunity to do so. Thereafter, the court, with counsel and Gully present, individually examined each of the jurors in chambers. Generally, the court questioned each of the jurors as to whether there had been any preliminary discussions among the jury concerning Gully's guilt or innocence. All twelve jurors denied that any such discussions had

taken place. The consensus among the jurors was that they had barely spoken to one another at all, let alone about the trial.

It was subsequently discovered that the juror who sent the text messages was previously excused as a juror due to a family illness. Despite this, Gully moved for a mistrial on the ground that the juror violated the court's admonition. The court denied the motion and proceeded with trial, but stated it still wanted to hear from the dismissed juror, noting: "[I]f we come back and find out any of the people are not telling us the truth, you know we will have a mistrial." After the jury rendered its verdict, the court noted its intention to subpoena the juror and consider the issue in conjunction with post-trial motions.

The juror ultimately testified at the hearing on post-trial motions. The court examined the juror as follows:

> THE COURT: During the time you were on the jury, there were statements made—I don't know what you call it, text messaging and in which—And I'm looking at the first page, so you can see there too, is the statement, "Been here since 9 today. Yesterday I was here from 8 to 3:30." Is that something you wrote?
> THE WITNESS: Yeah.
> THE COURT: It goes on. It says, "How's it looking for him, guilty or not guilty?" "What u think?" Is this your statement, "They are all saying guilty. Krystal was in here testifying a bit ago." Who's Krystal? Was she—
> THE DEFENDANT: My kids' mother.
> THE COURT: All right. But you said, "They're all saying guilty." Who is "they?"
> THE WITNESS: I didn't even mean it like the jurors were saying guilty or anything like that. I mean, I was just saying, like, in general. I didn't mean anything.
> THE COURT: Okay. Let me get real specific. Did you ever hear any of the jurors, during the time that you were there, commenting about Mr. Gully's guilt or innocence in this case?
> THE WITNESS: We never even talked to each other, nothing. None of us ever really said anything to each other. The only thing I can really remember that were said is the people saying, one guy— I cannot even tell you his name or anything like that. But one of the

guys, he was in there and said something about, like, why we all have to be like so private about it or whatever because—I don't even know how he worded it, but about us being private and it was like an open court or whatever. That's literally all I remember. None of us talked or anything like that.

THE COURT: Okay. But he didn't—This fellow did not express an opinion?

THE WITNESS: No, nothing about Bryce being guilty or—

THE COURT: Only about this admonition not to discuss the case?

THE WITNESS: Yes. Other than that, nothing.

THE COURT: All right. Okay. All right. But that is your statement under oath that none of the jurors, when you were there, were commenting regarding Mr. Gully's guilt or innocence prior—during the time that you were there?

THE WITNESS: Yes, that is my message.

Following the juror's testimony, Gully's counsel renewed his motion for a mistrial and new trial. The court denied the motions.

On appeal, Gully argues the juror's testimony "clearly indicate[s] that jurors had made up their mind as to the guilt or innocence of the defendant prior to the case being submitted" and his constitutional right to an impartial jury was therefore violated. The district court succinctly ruled as follows:

In regard to this issue, all 12 jurors were brought into the court chambers during the course of the trial, after we received this information. All of them were asked whether they had discussed the case with anyone else. They were under oath at the time. All 12 indicated they had not formulated an opinion and they had not conversed regarding their thoughts about it. Even though they may have still had their cell phones, may have been using their cell phones; the indication still is that the 12 jurors that made the determination regarding this case were not influenced by any outside influences whatsoever nor had they attempted to influence each other in the jury room.

That was further corroborated by the witness here today who said that even though she makes a statement, "They're all saying guilty," she says nobody on the jury made any indication of their opinion during the course of the trial while she was present. And so I'm going to deny the Motion . . . in regard to these issues at this time.

We find ample support in the record for the trial court's determination and therefore conclude the court did not abuse its discretion in denying Gully's motion for a mistrial and motion for a new trial on this issue. *See Jirak*, 491 N.W.2d at 796 (noting abuse of discretion will only be "found upon the denial of a mistrial only where there is no support in the record for the trial court's determination."); *see also State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015) (setting forth abuse of discretion standard of review for the denial of a motion for a new trial based upon juror misconduct or bias).

## IV. Sufficiency of the Evidence

In his motions for judgment of acquittal, Gully contended, among other things, there was insufficient evidence to show he possessed the items for which he was charged with possessing. The court denied the motions. On appeal, Gully argues the evidence was insufficient to show he constructively possessed the narcotics or that he constructively possessed the firearms for purposes of enhancement under Iowa Code section 124.401(1)(e). He argues constructive possession "cannot be inferred because he did not have exclusive control over the area where the contraband was found"; the home in which the drugs and firearms were found was not his primary residence; and someone else, Dayton, had been previously living in the area of the home (the basement) where the items were located.

Challenges to the sufficiency of the evidence are reviewed for corrections of errors at law. *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018). The court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*,

905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. "[W]e will uphold a verdict if substantial evidence supports it." *Wickes*, 910 N.W.2d at 563 (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *Ramirez*, 895 N.W.2d at 890). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only question is whether the evidence supports the finding actually made. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010). In considering a sufficiency-of-the-evidence challenge, "[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)); *accord State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive.").

As the parties readily acknowledge, this was a constructive-possession case, as neither the guns nor drugs were found on Gully's person. *See State v. Reed*, 875 N.W.2d 693, 705 (Iowa 2016) ("Possession may be actual or constructive." (footnote omitted)); *State v. Vance*, 790 N.W.2d 775, 784 (Iowa 2010) (noting a person has actual possession of an item when the item is found on the person). As to each of the drug-possession and tax-stamp charges, the

jury was instructed the State was required to prove Gully possessed the drugs or taxable substances attributable to each charge. As to the felon-in-possession-of-a-firearm counts, the jury was instructed the State must prove Gully "possessed and/or had under his dominion and control, a firearm." As to enhancement of the drug-possession charges under section 124.401(1)(e), the jury was instructed the State must prove Gully "was in the immediate possession or control of a firearm during the commission of" the offenses.

Dominion and control is akin to constructive possession, and constructive possession applies to both drugs and firearms. *See Reed*, 875 N.W.2d at 705, 708. Constructive possession of firearms and drugs may be proven by inferences. *Id.* at 705. "Constructive possession may be inferred when the drugs or firearms are found on property in the defendant's exclusive possession." *Id.* However, where, as here, "the premises are jointly occupied, additional proof is needed." *Id.* The supreme court has identified a list of nonexclusive factors to consider in determining whether a defendant constructively possessed items discovered in jointly occupied structures:

> (1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.

*Id.* at 706 (quoting *State v. Kern*, 831 N.W.2d 149, 161 (Iowa 2013)). "The last factor is a 'catchall' that captures other relevant circumstantial or direct evidence." *Id.*

The evidence presented at trial reveals the following. In November 2015, Gully, at the very least, frequented Prince's residence, where Prince lived with her and Gully's two children. In the two weeks leading up to the search of her residence on November 27, Prince knew Gully to be involved in drug trafficking. Text messages retrieved from Gully's cellular phone, coupled with explanatory testimony from police officers, indicated the same. In the early morning hours of November 27, Gully arrived at Prince's residence, unannounced, and advised he could watch their children for the day. Prince did not let Gully in the residence when he arrived, nor did she see him initially enter the residence. Prince agreed to have Gully watch the children for the day, and she left the residence for her 6:00 a.m. shift at work. Approximately one or two hours later, law enforcement executed a search warrant on the residence. At this time, Gully and his two young children were present in the home. Police ultimately found the guns and drugs. Officers testified to their assessments that, due to the lack of dust and other debris on the dark-colored bag found above the furnace that ultimately contained the firearms, marijuana, cocaine, and other contraband, it could not have been stored above the furnace for very long. Gully's fingerprints were found on the mason jar in the kitchen, one of the Walmart sacks found in the duffel bag that contained marijuana, and another sack found in the duffel bag that contained two of the firearms. Likewise, Gully's DNA was found on one of the firearms in the duffel bag. Upon the evidence presented, the only people who previously had access to the residence, other than Gully's two young children, were Gully, Prince, and Dayton. When shown pictures of the dark-colored bag, its contents, and the mason jar during her testimony at trial, Prince stated she had never seen any of those items

before and denied they belonged to her. She also indicated the items did not belong to Dayton. Furthermore, Dayton had not lived in the residence since September, roughly two months before the search.

In addition to the direct physical evidence linking Gully to the guns and drugs, there was ample circumstantial evidence linking Gully to the contraband. Gully was one of three people with access to the residence; he was the only one of those three people who was known to sell drugs in the two weeks leading up to the search; Prince expressly denied she had ever seen the contraband in question and indicated it could not belong to Dayton; Dayton had not lived in the residence for roughly two months; officers testified the appearance of the bag found in the basement indicated it could not have been there for very long; and Gully arrived at Prince's residence, unannounced, shortly before the search of the residence and, aside from his children, he was the only person present in the home at the time the drugs were discovered. The evidence indicates that Gully was the only person with knowledge of the presence of the guns and drugs in the residence and that he therefore had the ability to maintain or control them. *See id.* at 705 (defining constructive possession).

Viewing the evidence in the light most favorable to the State and the verdict, including reasonable inferences, we conclude the evidence was sufficient to support the jury's finding that Gully constructively possessed the guns and drugs. We therefore affirm the district court's denial of Gully's motions for judgment of acquittal.

## V.      Sentencing

Gully objects to the application of sentencing enhancements as a result of crimes he committed as a juvenile, but for which he was tried as an adult, as in violation of his right against cruel and unusual punishment.  He asks us to "deem enhancements based on juvenile convictions categorically cruel and unusual punishment."  Gully only cites to our supreme court's ruling in *State v. Lyle*, 854 N.W.2d 378 (2014) to support his position.  But Gully was an adult at the time he committed the instant offenses, and the supreme court made clear that *Lyle* "has no application to sentencing laws affecting adult offenders."  854 N.W.2d at 403. *Lyle* does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday and provide them a clean slate for purposes of sentencing enhancement in relation to subsequent criminal convictions.  Furthermore, courts in other jurisdictions have rejected similar sentencing challenges.[4]  We find these

---

[4] *See, e.g.*, *United States v. Hunter*, 735 F.3d 172, 174–76 (4th Cir. 2013) (concluding sentencing enhancement defendant received based on convictions he committed as a juvenile did not amount to cruel and unusual punishment because "sentence enhancements do not themselves constitute punishment for the prior criminal convictions that trigger them" but instead only amount to punishment for the recent, adult offense), *cert. denied*, 134 S. Ct. 1908 (2014); *United States v. Edwards*, 734 F.3d 850, 852–53 (9th Cir. 2013) (concluding the enhancement of a "sentence for adult criminal conduct because [a defendant] committed crimes as a juvenile does not implicate" cruel-and-unusual-punishment protections); *United States v. Orona*, 724 F.3d 1297, 1309–10 (10th Cir. 2013) (holding use of a juvenile adjudication as a predicate offense for sentencing enhancement does not violate the ban on cruel and unusual punishment), *cert. denied*, 571 U.S. 1034 (2013); *United States v. Hoffman*, 710 F.3d 1228, 1231–33 (11th Cir. 2013) (rejecting argument that an enhanced sentence constituted cruel and usual punishment "because the basis for the statutory enhancement was two prior convictions for offenses [the defendant] committed when he was 17 years old"); *United States v. Graham*, 622 F.3d 445, 463 (6th Cir. 2010) (approving the use of "a juvenile-age offense to enhance the punishment for an adult-age offense"), *cert. denied*, 563 U.S. 1035 (2011); *United States v. Scott*, 610 F.3d 1009, (8th Cir. 2010) (approving the use of "prior convictions, juvenile or otherwise, to enhance the sentence of a convicted adult"), *cert. denied*, 562 U.S. 1160 (2011); *United States v. Salahuddin*, 509 F.3d 858, 864 (7th Cir. 2007) ("[T]he Eighth Amendment does not prohibit using a conviction based on juvenile conduct to increase a sentence . . . ."); *United States v. Mays*, 466 F.3d 335, 339–40 (5th Cir. 2006) (rejecting

decisions persuasive authority in support of our decision to reject Gully's challenge and decline to extend *Lyle* beyond its express terms. Finally, the United States Supreme Court has explained its stance on recidivism statutes as follows:

> When a defendant is given a higher sentence under a recidivism statute—or for that matter, when a sentencing judge, under a guidelines regime or a discretionary sentencing system, increases a sentence based on the defendant's criminal history—100% of the punishment is for the offense of conviction. None is for the prior convictions or the defendant's "status as a recidivist."

*United States v. Rodriquez*, 553 U.S. 377, 399 (2008). Gully is not being punished for his juvenile acts. His sentence is fully attributable to his conduct as an adult.

We affirm Gully's sentence in its entirety.

## VI. Ineffective Assistance of Counsel

Gully asserts the racial composition of the jury pool violated his right to a jury drawn from a fair cross-section of the community. Gully acknowledges error was not preserved on this claim, so he contends his trial counsel rendered ineffective assistance in failing to object to the racial makeup of the jury pool. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Ineffective-assistance-of-counsel claims are an exception to the traditional error-preservation rules.").

We agree with the State that the record is inadequate for us to consider Gully's claim on direct appeal. As such, we preserve this claim for postconviction-relief proceedings to allow for the development of a proper record and to provide trial counsel an opportunity to weigh in on the matter. *See Beryhill v. State*, 603 N.W.2d 243, 245 (Iowa 1999).

---

argument that use of defendant's juvenile conviction for enhancement of sentence for an adult conviction amounts to cruel and unusual punishment), *cert. denied*, 549 U.S. 1234 (2007).

**VII.     Conclusion**

We affirm Gully's conviction and sentence in their entirety.  We preserve

Gully's ineffective-assistance-of-counsel claim for possible postconviction-relief

proceedings.

**AFFIRMED.**