# IN THE COURT OF APPEALS OF IOWA

No. 19-1883
Filed March 17, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**STEVE ARMSTED,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Clinton County, John Telleen, Judge.

Steve Armsted appeals following his convictions for two counts of murder in the first degree. **CONDITIONALLY AFFIRMED AND REMANDED.**

Scott M. Wadding of Sease & Wadding, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

Heard by May, P.J., and Greer and Schumacher, JJ.

**MAY, Presiding Judge.**

The State accused Steve Armsted of killing Kevin Lambert and Steven Cox. A jury convicted Armsted of two counts of murder in the first degree. On appeal, Armsted argues: (1) there was insufficient evidence to establish the elements of first-degree murder; (2) the district court abused its discretion by admitting autopsy photographs; and (3) the district court erred by denying Armsted's request for additional time to collect and present evidence of systematic exclusion of African Americans in the jury-selection process. We conditionally affirm and remand for further proceedings detailed below.

## I. Facts and Prior Proceedings

On March 6, 2017, Kevin Lambert and Steven Cox were discovered dead in their home. Lambert was in a chair in the living room. Cox was on his bed in his bedroom. It appeared that Cox's bedroom door had been forced open.

Lambert and Cox suffered violent deaths. Autopsies revealed that each man received a single stab wound to the heart. Both men also suffered blunt-force injury to the left side of their heads, which could have rendered them unconscious.[1]

Investigators obtained security camera footage from neighbors. Based on the footage and Lambert and Cox's phone records, investigators believed they were killed on the morning of March 5. Autopsy results were consistent with a time of death between 2:00 a.m. and 3:00 a.m. on March 5.

---

[1] Other circumstances could have been involved. Lambert's "blood alcohol content was over four times the legal limit and the presence of cocaine was also detected in his system." Cox's "blood alcohol content was over three times the legal limit."

Security camera footage showed a person leaving Lambert and Cox's home at approximately 3:00 a.m. on March 5. The person walked down a nearby alley.

In that same alley, investigators found a knife in a recycling bin. Lambert and Cox's blood was on the knife. Lambert and Cox's stab wounds were consistent with the type of knife found in the alley.

Investigators found Lambert and Cox's wallets in their home. Both were devoid of any cash.

Investigators began looking into possible suspects. They learned that Steve Armsted was homeless but had been sleeping at Lambert and Cox's home. Armsted made a number of phone calls on their landline from March 2 to March 4. During that time, Armsted asked two individuals for $25 to $30 so that he could stay at Lambert and Cox's home over the weekend of March 4–5.[2]

DNA evidence also connected Armsted to Lambert and Cox's home. A hat was found in the living room. Armsted's DNA was present on the hat. Plus, Armsted was seen wearing the hat immediately prior to the murders. Armsted's DNA was also found on a cigarette butt. The hat and cigarette butt were both found next to Lambert's deceased body.

On the morning of March 5, Latoya Coleman met Armsted in the alley behind her home. Coleman was on her way to get drugs. Armsted joined Coleman, giving her $50 in cash for his share. After obtaining their drugs, they returned to Coleman's house. Coleman later testified that, when they got back to her house, Armsted was not acting like his usual self. She said Armsted became

---

[2] March 4, 2017, was a Saturday.

"panicky, jumping up to look out the window." And Armsted worried aloud that the police were coming. According to Coleman, Armsted "kept running in the kitchen, running anywhere and hiding under the couch and looking out the window, [saying] they were out there, they were coming." After Armsted left, Coleman noticed bleach was missing from her laundry room.

Two days later, on March 7, Armsted called his ex-girlfriend, Alfredia Canady, "sound[ing] terrified, crying, scared." Armsted asked Canady if she would give him a ride to the bus station so he could return to Mississippi, where Armsted used to work in a meat packing plant. Armsted told Canady that he was "in trouble" and that "he would be spending the rest of his life in jail." He also "said he probably wouldn't talk to [Canady] any more" and "if he was to go to Mississippi they would bring him back here and that's when he would spend the rest of his life in jail."

On March 8, police arrested Armsted on an unrelated charge. They collected the clothing he was seen wearing on the evening of March 4. His jeans had a hole in the left pant leg and had been stained with bleach. But neither the hole nor the bleach stains can be seen in the footage from March 4—the day before Lambert and Cox were murdered.

A drop of blood was also found inside Armsted's tennis shoe. There was not enough to make a DNA profile.

In an interview with law enforcement, Armsted was shown photographs from the crime scene. The interviewing agent testified that after he laid one of the photographs down, he

> pointed out various items that were depicted . . . for example, there's a remote control, a can, a magnifying glass and, [Lambert], [but] the

one thing you are focusing on right now is what you left after you killed these two guys and that's your hat and [Armsted] replied, yeah.

After showing Armsted a photograph taken from the security camera footage outside Lambert and Cox's home, Armsted "looked at that picture and there was a pause and [Armsted] said, that ain't me." Then, the agent showed Armsted "the photograph of the knife to show him that [they] found the murder weapon and he replied words to the effect, that wasn't me that did it, I don't care what you came up with." At the end of the interview, the agent told "Armsted that he wasn't being charged at that moment in time but eventually he would be charged with two counts of murder" and Armsted "said, okay."

The State charged Armsted with two counts of first-degree murder for the deaths of Lambert and Cox.

Prior to jury selection, Armsted asked the district court to discharge the jury panel and grant him additional time to prove "the racial makeup of this jury panel is inadequate." The district court denied Armsted's request.

During trial, Armsted objected to the admission of autopsy photographs. He argued the photographs were "duplicative" and unfairly prejudicial. The district court overruled Armsted's objection and admitted the photographs.

A jury found Armsted guilty as charged. Armsted now appeals.

**II. Analysis**

On appeal, Armsted challenges: (1) the sufficiency of the evidence; (2) the admission of autopsy photographs; and (3) the makeup of the jury venire.

## A. Sufficiency of the Evidence

We begin with Armsted's challenges to the sufficiency of the evidence supporting his convictions for murder in the first degree. He claims the evidence is insufficient to establish his identity as the murderer, malice aforethought, and premeditation and deliberation.[3]

Under Iowa law, we will "uphold a verdict if substantial evidence supports it." *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005); *see State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018) ("We review the sufficiency of the evidence for correction of errors at law."). Evidence is "substantial if it would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). "We view the evidence in the light most

---

[3] The jury was instructed as follows:
> Under [c]ount I, the State must prove all of the following elements of [m]urder in the [f]irst [d]egree:
> 1. On or about the 5th day of March, 2017, the [d]efendant stabbed Kevin Lambert.
> 2. Kevin Lambert died as a result of being stabbed.
> 3. The [d]efendant acted with malice aforethought.
> 4. The [d]efendant acted willfully, deliberately, premeditatedly, and with a specific intent to kill Kevin Lambert.
> If the State has proved all of the elements, the [d]efendant is guilty of [m]urder in the [f]irst [d]egree. If the State has failed to prove any one of the elements, the [d]efendant is not guilty of [m]urder in the [f]irst [d]egree and you will then consider the charge of [m]urder in the [s]econd [d]egree explained in Instruction N[umber] 27.

The jury instructions given for count II are the same as above, except they list Steven Cox in place of Kevin Lambert. Armsted did not object to the elements of the first-degree murder marshalling instructions. "Where, as here, the jury was instructed without objection, the jury instruction becomes law of the case for the purposes of reviewing the sufficiency of the evidence." *State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018) (citing *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) ("[Defendant] did not object to the instructions given to the jury at trial. Therefore, the jury instructions become the law of the case for purposes of our review of the record for sufficiency of the evidence.")).

favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record." *State v. Soboroff*, 798 N.W.2d 1, 5 (Iowa 2011). We make no distinction between direct and circumstantial evidence. *See Kelso-Christy*, 911 N.W.2d at 668 ("Direct and circumstantial evidence are equally probative." (citation omitted)).

*1. Identity*

We first address whether the State provided sufficient evidence to establish Armsted was the killer. Armsted emphasizes the lack of (1) "DNA evidence to establish a connection between Armsted and the victims"; (2) witnesses to the crimes; and (3) motive. Even so, substantial evidence suggested Armsted was the murderer. The district court summarized the record this way:

> There is more than adequate circumstantial evidence that if believed could support a reasonable jury in finding the defendant guilty of murder in the first degree. I will not restate all of it but the video evidence of the defendant being at the [victim's] house consistent with a time of death, the defendant using the victim's landline to call his friends and ex-girlfriend, the defendant telling Ms. Canady that if I get caught, I'll go to jail for the rest of my life. The knife being found along the route that would be consistent with defendant leaving the home. The defendant's blue jeans with the hole in it unexplained, that hole not being there previously in the videos but after the time of death of the victims, the hole in [his] blue jeans with the blue jeans smelling like bleach.
> There was just a myriad, small bits of circumstantial evidence which when considered together do—would—especially when viewed in the light most favorable to the State justify a reasonable jury in finding the defendant guilty of murder in the first degree.

We agree with the district court and conclude the State presented sufficient evidence for the jury to determine Armsted killed Lambert and Cox. *See Meyers*, 799 N.W.2d at 138.

*2. Malice aforethought, premeditation, and deliberation*

Armsted also argues that, even if there was sufficient evidence to show his involvement in these deaths, there was no evidence of malice aforethought, premeditation, or deliberation. But the State contends these arguments were not preserved below. We agree with the State.

In general, "[c]ounsel does not preserve error on a sufficiency-of-evidence issue when counsel makes a general motion for judgment of acquittal but fails to identify specific elements of the charge not supported by the evidence." *State v. Albright*, 925 N.W.2d 144, 150 (Iowa 2019). Here, Armsted's motion for acquittal focused exclusively on identity—who was the killer. His motion did not address any other "specific elements of" the first-degree murder charges. *See id.* In fact, counsel told the court that Armsted was *not* challenging other elements. Counsel explained: "Specifically at issue here, your Honor, *are not* the individual elements of either murder in the first degree or any of its lesser and included offenses but the issue of identification." (Emphasis added.) Given this record, we cannot find Armsted preserved error as to his current arguments about the specific elements of malice aforethought, premeditation, and deliberation.

Armsted suggests that, "[t]o the extent Armsted's counsel failed to preserve error, the Court should review the issue under the framework of an ineffective-assistance-of-counsel claim." Under Iowa Code section 814.7 (2019), however, Armsted's ineffective-assistance claims can only be addressed through an action for "postconviction relief pursuant to chapter 822," not through this direct appeal.[4]

---

[4] In *State v. Macke*, the supreme court held this restriction does "not apply to a direct appeal from a judgment and sentence entered before July 1, 2019." 933

**B. Admission of Autopsy Photographs**

Next, Armsted contends the district court abused its discretion by admitting four autopsy photographs of Lambert and six autopsy photographs of Cox. "[W]e generally review evidentiary rulings for abuse of discretion." *State v. Helmers*, 753 N.W.2d 565, 567 (Iowa 2008). "An abuse of discretion occurs when the trial court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017) (quotation marks and citations omitted).

Armsted claims the district court should have excluded the photographs under Iowa Rule of Evidence 5.403. It authorizes the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Iowa R. Evid. 5.403. This balancing of probative value against competing dangers is a classic "judgment call on the part of the trial court." *State v. Rodriquez*, 636 N.W.2d 234, 240 (Iowa 2001). As one learned treatise explains:

> Analyzing and weighing the pertinent costs and benefits [of admitting evidence] is no trivial task. Wise judges may come to differing conclusions in similar situations (or the same conclusions in different situations). . . . Accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers. On the theory that the trial judge is best situated to make these judgments as the case unfolds, the standard of review on appeal—"abuse of discretion"—is highly deferential. That a different outcome would have been more appropriate is not sufficient.

1 Robert P. Mosteller, *McCormick on Evidence* § 185 (8th ed. Jan. 2020 Update).

---

N.W.2d 226, 228 (Iowa 2019). But Armsted was sentenced in November 2019; so section 814.7 applies to Armsted.

Here Armsted argues the "probative value of the autopsy photographs was negligible [as i]t was undisputed that both Cox and Lambert died from a single stab wound to the heart region." Moreover, Armsted contends, these photographs "of the decomposing lifeless bodies of the victims created substantial danger of the jury rendering their verdict on the emotional impact of the photographs rather than the facts." And so, Armsted claims, the court was obliged to exclude the photographs.

We disagree. The district court carefully considered the photographs and the record as a whole. And the court appropriately balanced the benefits and costs of admitting the photographs. The court explained:

> The court concludes that the photographs are clearly relevant. There may not be much dispute about the fact that the decedents were killed by knife wounds, I think they are relevant to show malice aforethought, I think they are relevant as to—somewhat relevant at least in my mind that it appears from looking at the photographs that there's a single stab wound each into the heart. There has been some testimony that the defendant was good with knives and the fact that there's a single stab wound each at least arguably goes to sort of a planned attack, at least arguably in a way, as opposed to a knife fight or controversy. It's [also] consistent with, for instance, Mr. Lambert being asleep in his chair and stabbed or something. Of course I don't know, that's speculation, but I think it's relevant to the cause of death, malice aforethought, premeditation perhaps and in terms of autopsy photos that I've seen, these are rather antiseptic, I might call them. These are not particularly gruesome compared to certainly other crime scene photographs I've seen, they are rather antiseptic. I don't think they are particularly inflammatory and I don't think there's so many of them that the State is trying to overwhelm the defense with many, many, many accident photos. It seems to be a fairly limited number and so the motion—probative value is not outweighed by the prejudicial effect, so the motion in limine is overruled.

Based on our review of the record—including the photographs themselves—we conclude this ruling was well within the court's discretion. So we

decline to reverse. *See State v. Brown*, 397 N.W.2d 689, 700 (Iowa 1986) (holding that where the pathologist "testified extensively with respect to the nature, extent, and severity of [the victim's] wounds," the "autopsy photographs were relevant to illustrate and explain [the pathologist's] testimony" and noting "[m]urder is often a gruesome affair giving rise to equally gruesome evidence").

## C. Fair Cross-Section Claim

Finally, we address Armsted's claim that "the district court erred in denying [him] a recess to meaningfully evaluate a fair cross-section claim through fact investigation and expert testimony." "We review constitutional questions de novo. This includes claims of systematic exclusion of a distinctive group from the jury pool . . . ." *State v. Veal*, 930 N.W.2d 319, 327 (Iowa 2019) (citation omitted). As our supreme court explained in *State v. Plain*:

> [A] defendant can establish a prima facie violation of the fair cross-section requirement by showing
> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

898 N.W.2d 801, 821–22 (Iowa 2017) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)), *holding modified by State v. Lilly*, 930 N.W.2d 293 (Iowa 2019).

Armsted raised the fair cross-section issue at the beginning of voir dire. His counsel made this record:

> [I]n this particular case the defendant is African American [and] the two victims are Caucasian or white. Of the eighty that are currently seated as prospective jurors . . . it appears only one individual . . . is of a minority status, he is Hispanic/Latino/Spanish origin. Of the eighty seated[,] none . . . indicate or identify their race as African

American.   I was advised informally before walking in here . . . perspective juror eighty-one is . . . African American. . . .   I don't know what the African American makeup is of Clinton County, I do not have that information, I believe someone in charge of the jury pool would have a better number as far as the number of African Americans in this community.  Because again there are no African Americans listed, the only one potentially listed is [juror] eighty-one and will not be reached by process of jury selection, I believe the racial makeup of this jury panel is inadequate and ask that the entire jury panel be discharged.

The State resisted, asserting Armsted failed to establish the third *Plain* element—systematic exclusion of potential jurors based on their race in the jury-selection process.  Defense counsel responded:

In order for us to establish [prong] three, we would have to show a pattern that's revealed itself over a significant period of time. Those resources are simply not generally made available to counsel particularly in advance of an individual trial.  In order for [prong] three to be argued in this particular juncture we need a significant recess in order to have Clinton County . . . run those numbers.
. . . .
Additionally, in this supreme court's analysis of the *Duran-Plain* cases as applicable in *Veal*, for the defendant to prove that type of causation we are discussing, they have held that . . . run-of-the-mill jury management practices can under appropriate circumstances constituting systematic exclusion and that's what we are arguing here today.  That it is the run-of-the-mill jury management practices, nothing above and beyond that, we are alleging that the systematic exclusion that would meet prong three under *Duran-Plain*.

The court denied Armsted's motion, finding "that the defense has failed to establish the third prong of the *Duran* test and *State v. Plain*."

On appeal, Armsted asks us to remand so he can further develop the record on the fair cross-section issue.  In response, the State concedes Armsted established the first and second prongs of his fair-cross section claim.[5]  Moreover,

---

[5] We rely on the State's appellate brief.  During oral argument, the State advised that, after reconsidering the math, it did not appear Armsted had established the

the State notes that if we find "Armsted[] has preserved a substantive constitutional challenge to the district court's refusal to grant a continuance/recess, [we] should conditionally affirm his convictions and remand to the district court for the development of the record."  *See id.* at 828 ("Defendants are entitled to access the information needed to enforce their constitutional right to a jury trial by a representative cross-section of the community."); *State v. Buchanan*, No. 17-1713, 2018 WL 6120044, at *2 (Iowa Ct. App. Nov. 21, 2018) (holding that "[b]ecause defendants are entitled to access the information necessary to enforce their right to a jury drawn from a fair cross-section of the community, we conclude the district court should have granted [defendant's recess] request and allowed him to investigate the matter").

Following the State's lead, we have considered whether Armsted sufficiently preserved his challenge to the district court's refusal to grant a continuance or recess.  We conclude he did.  Accordingly, we conditionally affirm Armsted's convictions and remand to the district court so that Armstead can have an opportunity to develop the record on his fair-cross section claim.  After the record is developed, the district court should determine whether Armsted's constitutional right to a representative jury was violated.  If it was, the court should grant a new trial.

**III. Conclusion**

Armsted's convictions for first-degree murder are supported by sufficient evidence.  The district court did not abuse its discretion in admitting autopsy

---

second element.  The State may raise these concerns with the district court on remand.

photographs. So we conditionally affirm Armsted's convictions. But we remand for the district court to provide Armsted a chance to investigate and present his fair cross-section claim.

**CONDITIONALLY AFFIRMED AND REMANDED.**

Schumacher, J., concurs; Greer, J., concurs specially.

**GREER, Judge** (concurring specially).

I concur in the majority opinion because of the concession by the State, but I write to highlight the practical dilemma playing out in cases across our state where a fair cross-section challenge is raised. Does a *Plain/Duran* challenge arise only after arriving at trial and surveying the jury so that a continuance to develop the argument becomes a matter of ordinary practice? How do trial courts resolve the tension between continuing a criminal trial to address the *Plain/Duran* prongs as opposed to requiring that the information to support the challenge be brought to the battle? After all, our common quest is for a fair trial and we now have a playbook to address an impartial jury challenge.

Our trial courts, prosecutors, and criminal defense litigators have struggled with the proper process to analyze an impartial jury challenge. In 2017, with the *Plain* "playbook" in hand, the case was remanded so the defendant could address a fair cross-section claim and the door was opened to county records useful to address the challenge. *See State v. Plain*, 898 N.W.2d 801, 828–29 (Iowa 2017). The "post-*Plain* world" "demanded significant changes in jury selection and management by judges, court administrators, jury managers, prosecutors and defense lawyers . . . ."[6] Russell E. Lowell II & David S. Walker, *Achieving Fair Cross-Sections on Iowa Juries in the Post-Plain World: the Lilly-Veal-Williams*

---

[6] In *Plain* the defendant was denied access to the county's information necessary to prove a prima facie case of the underrepresentation of a fair cross-section issue. 898 N.W.2d at 828 ("Defendants are entitled to access the information needed to enforce their constitutional right to a jury trial by a representative cross-section of the community. . . . To the extent Plain did not meet his prima facie case with respect to the third prong of the test, we conclude he lacked the opportunity to do so because he was not provided access to the records to which he was entitled.").

*Trilogy*, 68 Drake L. Rev. 499, 511 (2020) (hereinafter Lowell & Walker). So, the lessons continued after our supreme court produced the trilogy of cases on the subject in 2019. *See State v. Lilly*, 930 N.W.2d 293 (Iowa 2019); *State v. Veal*, 930 N.W.2d 319 (Iowa 2019); *State v. Williams*, 929 N.W.2d 621 (Iowa 2019).[7]

These three cases, particularly *Lilly*, aid the participants in framing the tough questions that occur in the analysis of the *Plain/Duran* prongs. And in *Lilly*, the court noted

> *Because the parties did not have the benefit of these refinements to the Duren/Plain standards*, we have decided today to follow the same course of action as in *Plain*. That is, we will remand this case to give Lilly a further opportunity to develop his arguments that his Sixth Amendment and article I, section 10 rights to an impartial jury were violated.

930 N.W.2d at 308 (emphasis added) (citation omitted). Now that parties have the benefit of the refinements, they arrive at the courthouse knowing the steps to prove the more difficult second and third prongs of the *Plain/Duran* test. *See id.* at 301–08. The proof can include considerations of other earlier jury pools. *Id.* at 305. And as *Lilly* suggested, "[t]his would almost always require expert testimony concerning the precise point of the juror summoning and qualification process in which members of distinctive groups were excluded from the jury pool and a plausible explanation of how the operation of the jury system resulted in their exclusion." 930 N.W.2d at 307.

---

[7] In *Lilly* and *Williams,* defendants filed motions to challenge the jury panels in advance of trial. *Lilly*, 930 N.W.2d at 297; *Williams*, 930 N.W.2d at 627. In *Veal*, the court allowed the defendant extra time to develop the challenge. 930 N.W.2d at 326. The defendants in all three cases compared census data with jury data. *Lilly*, 930 N.W.2d at 297; *Veal*, 930 N.W.2d at 326 n.2; *Williams*, 930 N.W.2d at 625.

In a 2018 case by one of the panels of our court, the State voiced concern over multiple and frequent continuances of the trial and our court said, "[T]he jury-composition issue did not reveal itself until the morning of trial, at which time defense counsel recognized it and raised the issue." *State v. Buchanan*, No. 17-1713, 2018 WL 6120044, at *2 (Iowa Ct. App. Nov. 21, 2018) (remanding to address the third prong in *Plain*). Then in 2020, a *Plain/Duran* motion was denied when the defendant failed to establish in the record the racial makeup of jurors of the entire jury pool that day as opposed to only those jurors allocated to the defendant's case.[8] *See State v. Wilson,* 941 N.W.2d 579, 593 (Iowa 2020). Following the lead of *Wilson*, another panel of our court addressed a challenge to a fair composition of the jury pool claim by denying remand because the defendant provided no detail related to the racial makeup of the jury pool. *See State v. Miller,* No. 19-0680, 2020 WL 7868232, at *2-3 (Iowa Ct. App. Dec. 16, 2020). Thus no prima facie showing was made to address either the second or third *Plain/Duren* prongs. *Id.* So, now in 2021, with the county census information available and law providing guidance to address the *Plain/Duran* prongs going into a trial, should we now expect a developed argument for resolution?

I do not have the answers, I just raise a practical problem for those with "boots on the ground"—trial judges and the lawyers.[9] Recognizing the importance

---

[8] Wilson filed a motion noting two recent Polk County jury pool of 255 and 234 potential jurors contained only eleven African American jurors each and four and seven Hispanic potential jurors respectively. Wilson suggested the court might randomly select Black and Hispanic jurors to address the disparity. But as to the record at trial, Wilson urged that of the one hundred potential jurors assigned to his trial, only three identified as African American and four as Hispanic.

[9] As has been pointed out:

of an impartial jury, the process is important.  Going forward, at a minimum, trial courts should start to expect a motion raising the potential fair cross-section issue and the county census information from which to start the discussion.

---

The litigation reality is that the parties and the judge will not know the racial composition of a defendant's own jury panel until jury service day.  If defense counsel waits until the morning of the day of trial to determine whether there is a fair cross-section issue, it will almost always be too late to do the necessary discovery and be prepared to make an informed presentation.  As a result, defense counsel must prepare the merits of the fair cross-section claim as to the aggregate date *before* seeing the jury panel in their client's case.

Lowell & Walker, 68 Drake L. Rev. at 534 (footnote omitted).